528 F.2d 31
 36 A.L.R.Fed. 477
 Aristedes A. DAY et al., Plaintiffs-Appellees,
v.
TRANS WORLD AIRLINES, INC., Defendant-Appellant.
Kate KERSEN, Individually and as Administratrix Ad
Prosequendum of the Estate of Elbert Kersen,
Deceased, Plaintiff-Appellee,
v.
TRANS WORLD AIRLINES, INC., Defendant-Appellant.
John SPIRIDAKIS et al., Plaintiffs-Appellees,
v.
TRANS WORLD AIRLINES, INC., Defendant-Appellant.
 No. 279, Docket 75--7341.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 3, 1975.
Decided Dec. 22, 1975.
 
 John N. Romans, New York City (Chadbourne, Parke, Whiteside & Wolff, New York City, P. G. Pennoyer, Jr., Charles K. O'Neill, Hilton H. Stothers, Jr., New York City, of counsel), for appellant Trans World Airlines, Inc.
 Nicolas Liakas, New York City (Mailman & Volin, New York City, of counsel), for appellees Aristedes A. Day and Constantine Day.
 Melvin I. Friedman, New York City (Kriendler & Kriendler, New York City, Milton G. Sincoff and Alan J. Konigsberg, New York City, of counsel), for appellee Kate Kersen.
 Before KAUFMAN, Chief Judge, and SMITH and FEINBERG, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 On August 5, 1973, at Hellenikon Airport in Athens, Greece, two Palestinian terrorists hurled three grenades and unleashed a salvo of small-arms fire into a line of passengers preparing to board TWA Flight 881 to New York. Three people died and more than forty others were injured by this senseless act of violence.
 
 
 2
 The Warsaw Convention,[1] as modified by the Montreal Agreement,[2] provides, among other things, that an airline is absolutely liable,[3] to the extent of a maximum $75,000, for bodily injury sustained 'in the course of any of the operations of embarking.'[4] We are called upon to decide whether, under these provisions, TWA must provide indemnification for the deaths and injuries sustained at Athens. Our conclusion is that TWA must be held liable and that this determination accords with the plain meaning and the underlying purpose of the Warsaw provisions.
 
 I.
 
 3
 It is necessary that we briefly describe the boarding procedures for international flights at Hellenikon Airport in August, 1973 as an aid to the resolution of the controversy before us. The prospective passenger, after entering the terminal, proceeded to the check-in counter of the airline whose aircraft he was to utilize. There, he presented his ticket, deposited his luggage, and paid the departure tax. In return, he was given a boarding pass and baggage check. The passenger then passed through Greek passport and currency control after which he descended a flight of stairs into the Transit Lounge. Only passengers waiting to board international flights were allowed inside the lounge area where they were required to remain until boarding. While the traveler waited for his flight to be called, he secured his seat assignment at the transfer desk located inside the lounge. When his flight was announced, he proceeded to the designated departure gate, where he and his hand baggage were searched by Greek policemen. The passenger then walked through the doors of the terminal building and crossed a short terrace outside. Finally, he boarded a bus which transported him to the waiting airplane.
 
 
 4
 The attack on the passengers of TWA Flight 881 occurred after they had gone through several of the required steps recited above and while they were standing in line at the departure gate, to which a TWA representative had summoned them, waiting to be searched. After seven passengers had been searched, the terrorists made their assault upon those standing in line.
 
 
 5
 As a result of this tragedy, several of the injured passengers and the executrix of a passenger who had died, brought suit against TWA in the Southern District of New York.[5] 28 U.S.C. §§ 1331, 1332. They claimed that the airline was liable under the Warsaw Convention for the injuries sustained and the death. After several cases were consolidated, the plaintiffs and the defendant moved for summary judgment on the issue of liability. Judge Brieant, in a thoughtful and thorough opinion, 393 F.Supp. 217 (S.D.N.Y.1975), granted the plaintiffs' motion. He also issued a certificate pursuant to 28 U.S.C. § 1292(b), and this interlocutory appeal followed.II.
 
 
 6
 Article 17 of the Warsaw Convention provides:
 
 
 7
 The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.[6]
 
 
 8
 Under the Montreal Agreement, liability for injuries described by Article 17 of the Warsaw Convention became absolute and the maximum damages were increased to $75,000. It is undisputed, moreover, that a terrorist attack is considered an 'accident' within the purview of these provisions. See Husserl v. Swiss Air Transport Co., 351 F.Supp. 702 (S.D.N.Y.1972), aff'd 485 F.2d 1240 (2d Cir. 1973, (per curiam). Thus, the sole issue we must resolve is whether the passengers sustained their injuries 'in the course of any of the operations of embarking or disembarking.'
 
 
 9
 TWA contended, both before Judge Brieant and on this appeal, that the application of Article 17 should be determined by reference only to the area where the accident occurred. Liability under the Convention should not attach, it urges, while the passenger is inside the terminal building. The very earliest time at which liability can commence, the appellant argues, is when the passenger steps through the terminal gate. Judge Brieant, however, believed that 'the issue . . . is not where (the plaintiff's) feet were planted when the killing began, but, rather, in what activity was he engaged.' 393 F.Supp. at 220. Applying a tripartite test based on activity (what the plaintiffs were doing), control (at whose direction) and location, the district judge determined that Article 17 covered the attack at the departure gate. We agree with this conclusion.
 
 
 10
 It seems elementary to us that the language employed in Article 17 must be the logical starting point. See Article 31(1), Vienna Convention on the Law of Treaties (hereinafter 'Vienna Convention'). We are of the view that the words 'in the course of any of the operations of embarking' do not exclude events transpiring within a terminal building. Nor, do these words set forth any strictures on location. Rather, the drafters of the Convention looked to whether the passenger's actions were a part of the operation or process of embarkation, as did Judge Brieant.[7]
 
 
 11
 It is clear that Article 17 does not define the period of time before passengers enter the interior of the airplane when the 'operations of embarking' commence. It is, nevertheless, appropriate to consider the activities of the plaintiffs in this case as falling within the purview of this somewhat cryptic phrase. The facts disclose that at the time of the terrorist attack, the plaintiffs had already surrendered their tickets, passed through passport control, and entered the area reserved exclusively for those about to depart on international flights. They were assembled at the departure gate, virtually ready to proceed to the aircraft. The passengers were not free agents roaming at will through the terminal. They were required to stand in line at the direction of TWA's agents for the purpose of undergoing a weapons search which was a prerequisite to boarding. Whether one looks to the passengers' activity (which was a condition to embarkation), to the restriction of their movements, to the imminence of boarding, or even to their position adjacent to the terminal gate, we are driven to the conclusion that the plaintiffs were 'in the course of embarking.'[8]
 
 
 12
 Moreover, a relatively broad construction of Article 17, affording protection to the plaintiffs under the Warsaw liability umbrella, is in harmony with modern theories of accident cost allocation. The airlines are in a position to distribute among all passengers what would otherwise be a crushing burden upon those few unfortunate enough to become 'accident' victims. See G. Calabresi, The Costs of Accidents at 39--45 (1970) (hereinafter 'Calabresi'). Equally important, this interpretation fosters the goal of accident prevention. Cf. Union Oil Co. v. Oppen, 501 F.2d 558, 569--70 (9th Cir. 1974). The airlines, in marked contrast to individual passengers, are in a better posture to persuade, pressure or, if need be, compensate airport managers to adopt more stringent security measures against terrorist attacks. Cf. Calabresi at 150--52. If necessary, the airlines can hire their own security guards. And, the companies operate under circumstances more conducive to investigating the conditions at the airports they regularly serve than do their passengers. Moreover, they can better assess the probabilities of accidents, and balance the reduction in risk to be gained by any given preventive measure against its cost.
 
 
 13
 Finally, the administrative costs of the absolute liability system embodied in the Warsaw Convention, as modified by the Montreal Agreement, are dramatically lower than available alternatives. If Article 17 were not applicable, the passengers could recover--if at all--only by maintaining a costly suit in a foreign land against the operator of the airport. The expense and inconvenience of such litigation would be compounded by the need to prove fault and the requirements of extensive pretrial investigation, travel, and other factors too difficult to anticipate. Such litigation, moreover, would often unduly postpone payments urgently needed by the seriously injured victim or his surviving dependents. See Rosenberg and Sovern, Delay and Dynamics of Personal Injury Litigation, 59 Colum.L.Rev. 1115 (1959).
 
 III.
 
 14
 TWA does not seriously challenge the validity of these textual and policy arguments in favor of extending coverage under the Warsaw Convention to the victims of the Athens attack. It contends, however, that this result is foreclosed by the legislative history of the Convention. This history, the airline claims, establishes that the framers intended to exclude from coverage all accidents occurring anywhere inside a terminal building. TWA correctly states that in interpreting a treaty we may look to its legislative history. See, e.g., Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933); Block v. Compagnie Nationale Air France, 386 F.2d 323, 336--38 (5th Cir. 1967); cf. Harvard Research in International Law, Law of Treaties: Draft Convention with Comment, Article 19 (1935) (hereinafter 'Harvard Research'); McNair, Law of Treaties at 411--23 (1961). We find, however, that, rather than undermining Judge Brieant's conclusions, the history of the Warsaw treaty bolsters them.
 
 
 15
 The Warsaw Convention was the product of two international conferences, one held in Paris in 1925, and another in Warsaw in 1929.[9] The Paris conference appointed a small committee of experts, the Comite Internationale Technique d'Experts Juridique Aeriens (CITEJA), to prepare a draft convention for consideration by the delegates at Warsaw. The version proposed by CITEJA would have extended accident coverage to passengers.
 
 
 16
 from the time when (they) enter the airport of departure until the time when they exit from the airport of arrival.
 
 Warsaw Minutes at 171.[10]
 
 17
 At the Warsaw conference, several of the delegates criticized this draft. Alcibiades Pecanha, the Brazilian delegates, proposed that Convention liability not attach until the passengers were actually inside the aircraft. Warsaw Minutes at 49. Prof. Georges Ripert, the French delegate, however, forcefully argued against both the CITEJA and the Brazilian proposals. It was, he observed, virtually impossible to draft a precise formula that would satisfactorily cover the myriad of cases that could arise. Prof. Ripert proposed that the article be recast in terms broad enough to allow the courts to take into account the facts of each case. See Warsaw Minutes at 49--50, 53--54.[11] The delegates voted to reject the CITEJA draft[12] and to accept the French suggestion. Id. at 57. The drafting committee then rewrote the CITEJA proposal in the form now set forth in Article 17.
 
 
 18
 The minutes of the Warsaw proceedings thus undermine TWA's contention that the delegates wished to implement a rigid rule based solely on location of the accident. Rather, we believe they preferred to provide latitude for the courts to consider the factual setting of each case by considering the elements we have referred to above.
 
 IV.
 
 19
 Those called upon to construe a treaty should, in the words of Judge Clark, strive to 'give the specific words of a treaty a meaning consistent with the genuine shared expectations of the contracting parties.' Maximov v. United States, 299 F.2d 565, 568 (2d Cir. 1962), aff'd 373 U.S. 49, 83 S.Ct. 1054, 10 L.Ed.2d 184 (1963). These expectations can, of course, change over time. Conditions and new methods may arise not present at the precise moment of drafting. For a court to view a treaty as frozen in the year of its creation is scarcely more justifiable than to regard the Constitutional clock as forever stopped in 1787. Justice Holmes's counsel concerning Constitutional construction, set forth in his opinion in Missouri v. Holland, 252 U.S. 416, 433, 40 S.Ct. 382, 383, 64 L.Ed. 641 (1920), applies with equal force to the task of treaty interpretation:
 
 
 20
 (W)hen we are dealing with words that also are a constituent act . . . we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters.
 
 
 21
 The conduct of the parties subsequent to ratification of a treaty may, thus, be relevant in ascertaining the proper construction to accord the treaty's various provisions. See Pigeon River Improvement Slide & Boom Co. v. Cox, 291 U.S. 138, 158--63, 54 S.Ct. 361, 78 L.Ed. 695 (1934); Husserl v. Swiss Air Transport Co., supra; Harvard Research, Article 19; M. McDougal, H. Lasswell and J. Miller, The Interpretation of Agreements and World Public Order 56, 58 (1967); II. C. Hyde, International Law 72 (1922); Vienna Convention Art. 31(3).[13]
 
 
 22
 In divining the purposes of the Warsaw treaty, we find the adoption in 1966 of the Montreal Agreement particularly instructive. This Agreement did not alter the language of Article 17 of the Warsaw Convention. But it provides decisive evidence of the goals and expectations currently shared by the parties to the Warsaw Convention.
 
 
 23
 The Montreal Agreement was adopted in response to a torrent of criticism of the stringent Warsaw limitations of liability.[14] For example, in August, 1965, Senator Robert Kennedy suggested on the Senate floor that the United States should consider denouncing (i.e. withdrawing from) the Warsaw Convention. 'Over 2 million Americans travel annually on international flights,' he stated.
 
 
 24
 Assuring that they and their families are adequately protected in case of accident is, consequently, a matter of widespread importance . . . No one questions the fact that the protection now afforded international travelers is woefully inadequate.
 
 
 25
 111 Cong.Rec. 20164 (1965).
 
 
 26
 On November 15, 1965, the State Department filed formal notice of denunciation of the Warsaw treaty, to take effect six months later. An accompanying press release stated that the United States would be prepared to withdraw its denunciation if the principal international air carriers agreed to raise the liability ceiling to $75,000 and if there was a reasonable prospect that the Convention would be formally amended to incorporate this modification. 50 Dept. State Bull. 923 (1965).
 
 
 27
 The Warsaw signatories were, needless to say, not unduly sanguine about the vitality of the Warsaw treaty absent the world's largest aviation power. Accordingly, on May 13, 1966, after months of intense negotiation, the world's major airlines, virtually without exception, signed what became known as the Montreal Agreement. Under the terms of this agreement, each airline filed a special contract with the Civil Aeronautics Board raising the liability limit to $75,000 on all flights to, from, or stopping over in the United States. It is important to note, in addition, that the carriers also agreed to waive the defense of due care. Liability was to become absolute unless the passenger himself were at fault.
 
 
 28
 It cannot be doubted, therefore, that the Warsaw Convention now functions to protect the passenger from the many present-day hazards of air travel and also spreads the accident cost of air transportation among all passengers.[15] Husserl v. Swiss Air Transport Company, Ltd., 351 F.Supp. 702 (S.D.N.Y.1972), aff'd, 485 F.2d 1240 (2d Cir. 1973) (per curiam). This is amply demonstrated by the imposition of absolute liability and the establishment of greatly increased limits of liability. The official statements made by the State Department, the prime mover behind the Montreal modifications, reinforce this conclusion.[16] Thus, the official notification of withdrawal of denunciation stated that
 
 
 29
 the conditions which led the United States to serve its notice of November 15 have substantially changed. Accordingly, the United States of America believes that its continuing objectives of . . . adequate protection for international air travelers will best be assured within the framework of the Warsaw Convention.
 
 
 30
 Quoted in Dept. of State Press Release No. 111, 54 Dept. of State Bull 955--57 (1966).
 
 
 31
 We conclude, in sum that the protection of the passenger ranks high among the goals which the Warsaw signatories now look to the Convention to serve.[17] We would add, however, that even if we restricted our interpretation to the intent and purposes of the Warsaw treaty as of 1929, we would reach the same result.
 
 
 32
 Since 1929, the risks of aviation have changed dramatically in ways unforeseeable by the Warsaw framers.[18] Air travel hazards, once limited to aerial disasters, have unhappily come to include the sort of terrorism exemplified by the Athens attack. As that incident graphically demonstrates, these new perils often spill over into the airline terminal.
 
 
 33
 The Warsaw drafters wished to create a system of liability rules that would cover all the hazards of air travel. Cf. Sullivan, The Codification of Air Carrier Liability by International Convention, 7 J. Air. L. 1, 20 (1936); Calkins, The Cause of Action under the Warsaw Convention, 26 J.Air.L. 217 (1959). The rigid location-based rule suggested by the appellant would ill serve that goal. Under TWA's test, many claims relating to liability for the hazards of flying would be excluded from the Warsaw system and would be governed by local law. Rather than serving the drafters' intent of creating an inclusive system, appellant's proposal would frustrate it.
 
 
 34
 We believe, moreover, that the result we have reached furthers the intent of the Warsaw drafters in a broader sense. The Warsaw delegates knew that, in the years to come, civil aviation would change in ways that they could not foresee. they wished to design a system of air law that would be both durable and flexible enough to keep pace with these changes. Our holding today confirms the framers' belief that the ever-changing needs of the system of civil aviation can be served within the framework they created.
 
 
 35
 Accordingly, we affirm.
 
 
 
 [1]
 The Warsaw Convention is officially denominated 'Convention for the Unification of Certain Rules Relating to International Transportation by Air.' Concluded at Warsaw, Poland on October 12, 1929, the Convention is reproduced (in an English translation of the official French version) at 49 Stat. 3000 (1934)
 
 
 [2]
 Agreement CAB 18900 (1966)
 
 
 [3]
 There is an exception, not relevant in this case, for contributory negligence
 
 
 [4]
 Warsaw Convention, Art. 17
 
 
 [5]
 At the time of the attack, plaintiffs Aristedes and Constantine Day were being escorted by a TWA passenger relations agent to the departure gate. All the other plaintiffs were standing in line waiting to be searched. We agree with Judge Brieant that these differences in location have no significance to the outcome of this case
 
 
 [6]
 The official version in French, is reproduced at II Conference Internationale de Droit Prive Aerien (1930) (hereinafter 'Warsaw Minutes')
 
 
 [7]
 The French word 'operation' contained in the official version of the Warsaw Convention connotes a process composed of many acts. It is defined in the Nouveau Petit Larousse (1950) as 'Ensemble de moyens que l'on combine pour en obtenir un resultat,' or 'a group of procedures combined to achieve a result.'
 
 
 [8]
 We find MacDonald v. Air Canada, 439 F.2d 1402 (1st Cir. 1971), cited to us by the appellant, clearly distinguishable. In MacDonald, the court declined to construe Article 17 as covering an elderly passenger who fell after disembarking. Mrs. MacDonald was, at the time of her accident, standing near the baggage 'pickup' area, waiting for her daughter to recover her luggage. Mrs. MacDonald was, therefore, not acting, as were the passengers in the case at bar, at the direction of the airlines, but was free to move about the terminal. Furthermore, she was not, as were the plaintiffs here, performing an act required for embarkation or disembarkation. We do not, of course, indicate any views on the correctness of the MacDonald decision
 
 
 [9]
 The history of the Warsaw Convention is discussed in Lowenfeld and Mendelsohn, The United States and the Warsaw Convention, 80 Harv.L.Rev. 497 (1967) (hereinafter 'Lowenfeld and Mendelsohn'); and in Ide, The History and Accomplishments of the CITEJA, 3 J.Air.L. 27 (1932)
 
 
 [10]
 The original minutes are in French; we quote this clause in the translation provided in TWA's brief and certified by Prof. M. Riffaterre of Columbia University
 
 
 [11]
 Prof. Ripert has been referred to as 'the dean of French writers on civil law.' Lowenfeld, Aviation Law, VI--16 (1972)
 
 
 [12]
 TWA argues that the rejection of the CITEJA draft manifested an intent to exclude from Warsaw coverage all accidents occurring within a terminal building. We disagree. It is our view that the delegates' action constituted a rejection of a rigid location-based test in favor of the more flexible approach espoused by Prof. Ripert
 Even if we were to disregard this legislative history, the most we could infer from the rejection of the CITEJA formula would be a reluctance to cover all accidents occurring inside a terminal, not a determination that no such accidents should be covered.
 
 
 [13]
 We find Prof. Hyde's words especially relevant:
 A court might even feel obliged to sustain (the parties' later) construction of a treaty differing widely from that which it was in fact possible to prove to have been the design of the parties at the time when the agreement was concluded.
 II Hyde, supra, at 72. In so acting, the court does not, of course, impose its own values upon the parties. Rather, the court does no more than respect and implement the goals and intentions of the parties.
 
 
 [14]
 See generally Lowenfeld and Mendelsohn; Lowenfeld, supra note 11, Chapter 6; and 1. L. Kriendler, Aviation Accident Law, Chs. 11--12A (1971). The Warsaw Convention limited liability to $8300 and provided the airline with a defense of due care
 
 
 [15]
 Although it was the foreign airlines, and not their respective governments, who signed the agreement implementing these modifications, the governments whose carriers were to participate in the plan formally assured the United States, at the request of the State Department, that they would permit the new plan to go into effect. Lowenfeld and Mendelsohn at 594, 595. In assessing the expectations of these foreign governments, we also find the 1971 Guatemala Protocol significant. That protocol, adopted by a diplomatic conference at which 55 countries were represented, has been signed to date by more than 20. The protocol will formally amend the Warsaw treaty in a manner similar to the Montreal Agreement to provide for absolute liability up to $100,000. See Lowenfeld, supra, at § 6.2; Mankiewicz, The 1971 Protocol of Guatemala City, 38 J.Air.L. 519 (1972)
 
 
 [16]
 Indeed, our government's concept of the goals of a treaty must be given great weight even if the other parties hold a different view of its meaning. See Factor v. Laubenheimer, 290 U.S. 276, 298, 54 S.Ct. 191, 78 L.Ed. 315 (1933)
 
 
 [17]
 TWA, citing several treaties and articles, e.g., Sullivan, The Codification of Air Carrier Liability by International Convention, 7 J.Air.L. 1, 20 (1936), contends that 'authorities the world over' hold that Warsaw coverage is defined by location and does not extend to accidents occurring inside a terminal building. The simple answer to this argument is that the commentators are far from uniform. Shawcross and Beaumont, in their treatise on Air Law (3rd ed. 1966), state that coverage extends throughout 'the time during which the passenger's movements are under the control of the carrier for the purposes of embarking' and suggest that this includes 'injury . . . while leaving the passenger building.' Id. at 441--42. Mateesco Matte, similarly, states that coverage begins when the passengers are taken in charge by the airline. N. Mateesco Matte, Traite de Droit Aerien-Aeronautique at 404--05 (1964). De Juglart regards Article 17 as possibly providing coverage for at least some events occurring within the terminal building. M. de Juglart, Traite Elementaire du Droit Aerien at 330 (1952) (Preface by G. Rippert). Accord, Heller, Proposed Revision of Article 17 of the Warsaw Convention, 20 Int'l & Comp.L.Q. 142, 146 (1971). And, the Court of Appeal of Berlin, in Blumenfeld v. BEA, 11 ZLW 78 (1962), has held that Article 17 covers a passenger who falls down a staircase leading from the terminal to the traffic apron. The court, significantly, stated that the Convention applies because
 the air carrier already commits the flight passengers under his care when he requests them to go from the waiting room to the aircraft. (Emphasis added)
 We note, moreover, that most of the texts and commentaries cited by TWA date from the 1930's; virtually all were written before 1965. They thus antedate the 1965 United States denunciation and the subsequent Montreal Agreement. The writers of these early treatises, moreover, could foresee neither the advent of air terrorism nor the radical changes in boarding procedures that the ensuing years would bring. Additionally, the purported goal of worldwide uniformity could not have been paramount in the minds of the framers of Article 17, for they contemplated a case-by-case application by the courts that would, to some extent at least, rely on local law.
 
 
 [18]
 Some commentators have suggested that when confronted with such genuine gaps in the parties' expectations, the interpreter should consider accepted policy goals, such as accident prevention, in filling them. See, e.g., McDougal, supra, at 260--61
 It is relevant in this connection that the technology of embarkation has also changed in ways unforeseeable to the Warsaw delegates. Moreover, airports are today far larger and boarding procedures substantially more complex than forty-six years ago. And, many of the operations of embarking have been moved inside the terminal building. Indeed, even the boarding ladder, now being increasingly replaced by the jetway, may soon become an anachronism.