Ruth Ann REED, as Administratrix of the Estate of Dan William Reed, Deceased, and as parent, natural guardian, and best friend of Cynthia Ann Reed, et al., Plaintiffs,

v.

Forwood Cloud WISER, Jr., and Richard E. Neuman, Defendants.

No. 75 Civ. 4015(MEF).

United States District Court, S. D. New York.

April 19, 1976.

Kreindler & Kreindler, New York City, for plaintiffs; Lee S. Kreindler, Milton G. Sincoff, Stanley J. Levy, James D. Veach, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for defendants; John J. Martin, Edward M. O'Brien, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

On September 8, 1974, Trans World Airlines ("TWA") Flight 841, en route from Athens, Greece,[1] and bound for the John F. Kennedy Airport in New York City, crashed in the Ionian Sea, approximately 100 miles west of Araxos, Greece. All persons aboard were killed. The crash has given rise to a number of suits here and in other federal courts, all of which are now in this court for pretrial purposes pursuant to a ruling of the Multidistrict Litigation Panel.

The instant action was brought in New Jersey, and transferred to this district, by the personal representatives, heirs, and next of kin of nine of the passengers who died in the crash. Named as the only defendants are the President and the Staff

1. The flight had originated in Tel Aviv, Israel.

Vice President in charge of Audit and Security of TWA. The complaint alleges that the crash was due to the explosion of a bomb aboard the aircraft shortly after the takeoff from Athens. Further, it is alleged that the defendants, in their respective capacities at TWA, were responsible for the institution and maintenance of a security system sufficient to prevent placing of explosives on the aircraft, and that defendants' negligent failure to institute or maintain a satisfactory security system was the proximate cause of the disaster.

Defendants have interposed as a second affirmative defense the assertion that damages are limited to $75,000 for each decedent by the terms of the Warsaw Convention,[2] as supplemented by the Montreal Agreement.[3] Plaintiffs now move for an order, pursuant to Fed.R.Civ.P. 12(f), striking this second affirmative defense or, alternatively, for partial summary judgment under Rule 56.

The question thus raised is whether the Warsaw Convention's limitation of liability provisions are applicable to defendants, as employees of TWA, should they eventually be found liable.

Article 17 of the Warsaw Convention states:

"The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

Article 22, as modified by the Montreal Agreement, provides:

"In the transportation of passengers the liability of the carrier for each passenger shall be limited to the sum of [$75,000]."

Thus the relevant question, more precisely put, is whether the term "carrier" refers only to the corporate or other owning entity as such, here TWA, or also includes the employees and agents acting on the carrier's behalf.

■ The question has been ably and exhaustively briefed. It is by no means susceptible of a clear and entirely confident answer. It is answered here, for reasons which follow, in plaintiffs' favor.

1. The inquiry begins, though it cannot end, with the language of the treaty and its drafting history. See *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 33, 34 (2d Cir. 1975); McNair, *The Law of Treaties* 411–23 (1961). The Convention contains no definition of "carrier." Plaintiffs derive some textual support, if not a compelling argument, from the fact that the treaty language includes separate, distinguishing ref-

---

**2.** The Warsaw Convention is officially denominated "Convention for the Unification of Certain Rules Relating to International Transportation by Air." Concluded at Warsaw on October 12, 1929, the Convention is reproduced (in an English translation of the official French version) at 49 Stat. 3000 (1934). The Convention was the result of two international conferences, one held in Paris in 1925 and the second in Warsaw in 1929, and of the work done by the interim Comité International Technique d'Experts Juridique Aeriens ("CITEJA"). See generally Ide, *The History and Accomplishments of the International Technical Committee of Aerial Legal Experts (C.I.T.E.J.A.),* 3 J. Air L. & Comm. 27 (1932). The United States, which had not participated in the work of CITEJA, and had observed, but not participated in, the Warsaw Conference, proclaimed adherence to the treaty in 1934. 78 Cong.Rec. 11, 582 (1934) (Congressional approval); T.S. No. 876, 49 Stat. 3000 (1934).

**3.** The Montreal Convention is officially denominated "Agreement Relating to Liability Limitation of the Warsaw Convention and the Hague Protocol," signed May 13, 1966. The motivating force was "a torrent of criticism of the stringent Warsaw limitations of liability," *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 36 (2d Cir. 1975), which had held liability to $8,300 and provided the carriers with a defense of due care. *Id.* The State Department filed, on November 15, 1965, a formal notice of denunciation of the Warsaw treaty, to take effect six months later unless the principal international air carriers agreed to raise their liability ceiling, 50 Dept. State Bull. 923 (1965). The result of the Montreal Convention, which was accepted by the State Department, 54 Dept. State Bull. 955–57 (1966), was to raise the limit of liability to $75,000, including costs of litigation (or $58,000 plus costs of litigation in jurisdictions where there are provisions for separate awards of such costs), without regard to fault on the part of the carrier.

erences to carriers and their agents.[4] There is no indication, however, of deliberate attention to the question now confronted.[5]

The uncertainty resulting from the silence of the Warsaw Convention on our problem is reflected by a split in the sparse decisional authorities.[6] The two federal district courts that have passed on closely analogous issues have reached opposite results. Compare *Pierre v. Eastern Air Lines, Inc.,* 152 F.Supp. 486, 489 (D.N.J.1957),[7] with *Chutter v. KLM Royal Dutch Airlines,* 132 F.Supp. 611, 613 (S.D.N.Y.1955).[8]

2. With no unequivocal message from the language and history, we come to questions of policy. Here, again, there are pressures in both directions. The Warsaw Convention policy limiting liability, defendants' strongest support, had the well understood aim to protect infant air carriers from what were feared to be potentially fatal burdens of compensation to people injured or left bereaved while efforts to fly safely were proceeding.[9] It would be consistent with that policy to extend the protection to employees and agents, who might otherwise press for insurance or other forms of indemnity. And it is somewhat at odds with that policy to hold otherwise. It is not insignificant to note, however, that the original policy has lost a great deal of its persuasive force: air travel is no longer an infant industry.[10]

On the other side is a powerful national policy favoring compensatory damages from tortfeasors who cause personal injury.

---

**4.** See e. g., Article 20(1):

"The carrier shall not be liable if he proves that he.and his agents have taken all necessary measures to avoid the damage or that it was impossible for him or them to take such measures."

See also Article 25. A discussion of this argument may be found in M. Kamminger, *The Aircraft Commander in Commercial Air Transportation* 91 (1953); Pratt, *Carriage by Air Act—Limitation of Air Carrier's Liability—Whether Servants of Carrier Also Protected,* 41 Can.B.Rev. 124, 128 (1963).

**5.** Plaintiffs apparently agree, citing Ide, *The History and Accomplishments of the International Technical Committee of Aerial Legal Experts (C.I.T.E.J.A.),* 3 J. Air. L. & Comm. 27, 31, 37, 40 (1932), in making the statement that "the topic [of the status of crew members] was not treated at the Warsaw Conference."

Reference from the minutes to which the court's attention has been drawn seem at most to graze our problem. For example:

"Before examining the articles of the draft, it is necessary to bring out the fact that in this field, international agreement cannot be obtained unless it is limited to certain determined problems. Therefore the text only applies to the contract of carriage—first with respect to. its external forms, and second in the legal relationships which are established between the carrier and the persons carried or the shipper. It does not govern any other questions which the exploitation of the carriage may bring out."

Report of Henry DeVos, submitting the CITEJA draft text to the Warsaw Conference, Minutes of the Warsaw Convention, p. 160, as contained in Calkins, *Grand Canyon, Warsaw and the Hague Protocol,* 23 J. Air. L. & Comm. 253, 267 n. 7 (1956). See also the comments of Sir Alfred Dennis (of Great Britain), Minutes of Warsaw Convention, p. 29:

"The exception of navigational errors of the command of the aircraft, at first glance, does not seem to be in accord with common law, because under common law, a carrier is generally responsible for the errors of his agent."

See also *id.* at 44; comments of Mr. Ambrosini, of Italy, *id.* at 44.

**6.** For a discussion of the "conflicting opinions and decisions," see Pratt, *Carriage by Air Act, 1952—Limitation of Air Carrier's Liability—Whether Servants of Carrier Also Protected,* 41 Can.B.Rev. 124 (1963).

**7.** See also *Stratton v. Trans Canada Air Lines,* 27 D.L.R.2d 670 (British Columbia Supreme Ct. 1961), *aff'd on other grounds,* 32 D.L.R.2d 736 (British Columbia Ct.App. 1962).

**8.** See also *Wanderer v. Sabena and Pan American Airways, Inc.,* 1949 U.S. Aviation Reports 25 (Sup.Ct. N.Y. County 1949).

**9.** Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention,* 80 Harv.L.Rev. 497, 499 (1967); cf. Senate Comm. on Foreign Relations, *Message from the President of the United States Transmitting a Convention for the Unification of Certain Rules,* Sen.Exec.Doc. No. G., 73rd Cong., 2d Sess. 3–4 (1934).

**10.** We are reminded by *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 35 (2d Cir. 1975), that treaties, like constitutions, must be interpreted in light of modern day considerations: "For a court to view a treaty as frozen in the year of its creation is scarcely more justifiable than to regard the Constitutional clock as forever stopped in 1787."

A corollary principle of equal importance is the aversion of our law toward stipulations by common carriers "without congressional authority * * * against their own negligence or that of their agents or servants." *United States v. Atlantic Mutual Insurance Co.,* 343 U.S. 236, 242, 72 S.Ct. 666, 669, 96 L.Ed. 907, 914 (1952); *New York Central Ry. Co. v. Lockwood,* 84 U.S. (17 Wall.) 357, 21 L.Ed. 627 (1873). The absence of any express absolution in the Warsaw Convention embracing "agents or servants" must be deemed a cogent factor in the setting of American law. American adherence to the Warsaw Convention was not prompt, nor has it ever been particularly enthusiastic.[11] As all agree, the liability of the wrongdoing agent is a separate and clear source of redress, distinct from and logically prior to that of the principal. When the United States adhered to the Convention, it was not so exuberant a move as to warrant expansive constructions to amend firm national policies. This is, then, a fitting case in which to remember that a provision limiting liability for negligent injury is not readily to be inferred.[12] See, e. g., *Brady v. Roosevelt S.S. Co.,* 317 U.S. 575, 580–81, 63 S.Ct. 425, 87 L.Ed. 471 (1943).

On an issue not entirely dissimilar to the present one—on a claim perhaps less compelling, because dealing with property, not persons—the Supreme Court, in *Robert C. Herd & Co v. Krawill Machinery Corp.,* 359 U.S. 297, 79 S.Ct. 766, 3 L.Ed.2d 820 (1959), considered the reach of limitation of liability provisions in the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5).[13] Refusing to extend to a negligent stevedore the provi-

sion limiting an ocean carrier's liability to $500 per package of a shipper's cargo, the Court said, *id.* at 301–02, 79 S.Ct. at 769, 3 L.Ed.2d at 823:

"There is * * * nothing in the language, the legislative history or environment of the Act that expressly or impliedly indicates any intention of Congress to regulate stevedores or other agents of a carrier, or to limit the amount of their liability for damages caused by their negligence. It must be assumed that Congress knew that generally agents are liable for all damages caused by their negligence. Yet Congress, while limiting the amount of liability of 'the carrier [and] the ship,' did not even refer to stevedores or agents of a carrier. 'We can only conclude that if Congress had intended to make such an inroad on the rights of claimants [against negligent agents] it would have said so in unambiguous terms' and 'in the absence of clear Congressional policy to that end, we cannot go so far.' *Brady v. Roosevelt S.S. Co.,* 317 U.S. 575, 581, 584, 63 S.Ct. 425, 87 L.Ed. 471."

That interpretation of the Carriage of Goods by Sea Act is not conclusive, to be sure. But it is a highly persuasive analogy opposing the view of the defendants before us.

We are cited to authorities counseling strict construction of treaties, e. g., *Continental Dredging Co. v. County of Los Angeles,* 366 F.Supp. 1133, 1136 (C.D.Cal.1973); cf., *Isbrandtsen Co. v. Johnson,* 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294, 1299 (1951); *Texas & Pac. Ry. Co. v. Abi-*

---

**11.** Past decades have seen an outpouring of criticism surrounding the Convention's limitations on liability. See, e. g., 111 Cong.Rec. 15032 (1965) (remarks of Senator Yarborough); *id.* at 16125–26 (remarks of Senator Ervin); *id.* at 20164 (remarks of Senator Robert Kennedy); see generally, Lowenfeld & Mendelsohn, *supra* note 9, cf. *Day, supra* at 36.

**12.** Nor is the inference a necessary one. The present importance of the Warsaw Convention lies primarily in its assurance of at least some level of compensation, without the difficult and time-consuming necessity of proving negligence or lack of due care, *Day, supra* at 34,

36–37. Recoveries against persons other than the airline, in suits involving traditional standards of proof of negligence or breach of warranty, are not inconsistent with the standard of limited liability where far less is required for recovery.

**13.** "Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States * * * unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."

lene Cotton Oil Co., 204 U.S. 426, 437, 27 S.Ct. 350, 354, 51 L.Ed. 553, 557 (1907), along with others suggesting liberality, e. g., *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942); *Valentine v. United States ex rel. Neidecker*, 299 U.S. 5, 57 S.Ct. 100, 81 L.Ed. 5 (1936); *Eck v. United Arab Airlines, Inc.*, 360 F.2d 804, 812 (2d Cir. 1966). See generally McNair, *The Law of Treaties* 364–92 (1961). Without resting too heavily upon canons, we know this is not a case for loose interpretations. The limitation for agents and employees would have been easy enough to specify. It was not stated. Those who acted for the United States in adhering to the Warsaw Convention had among their premises a strong animus against discovering liability limitations by implication. The totality of circumstances counsels against our inferring any such provision.

If the policy of protection of carriers were to be gutted by an interpretation against defendants, the demand for a less equivocal text might be untenable. But the fact is that a perfectly plausible compromise was possible that left the employees exposed. Indemnity was by no means automatic. Separate claims against employees, as the slight litigation history suggests, need not have been foreseen as major threats. Whatever speculative reasons may account for it, the drafters left out what defendants now seek, and the omission cannot be said to have been stultifying. Moreover, since the removal of the "due care defense," [14] liability under the Warsaw Convention is certainly found under a different standard than liability outside it. See note 12, *supra*.

In short, if only the conflicting policies just noted were at stake, the court would incline to an interpretation favoring plaintiffs. But there is, as we proceed to note, at least a bit more to their position.

3. In 1955, most of the adherents and signatories to the Warsaw Convention adopted the amendments known for short as the Hague Protocol, officially "Protocol to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air Signed at Warsaw on 12 October 1929." [15] Among the amended provisions is a new Article 25A, which expressly resolves the issue before this court by extending the Warsaw limits of liability to the carrier's servants and agents acting within the scope of their employment. [16] The United States has declined to adhere to the Hague Protocol.

Both the Hague document and the non-assent of the United States are subjects arguable pro and con. The new Article 25A, it may be said, merely affirmed the pre-existing position. [17] Against that is the slightly stronger point that careful treaty

---

**14.** The "due care" defense was removed when the Montreal Agreement was adopted in 1966. *Day, supra* at 36.

**15.** A concise history of the drafting of the Hague Protocol, and the subsequent failure of the United States to adopt it, is given in Lowenfeld & Mendelsohn, *supra* note 9, at 504–52.

**16.** Article 25A provides:

"(1) If an action is brought against a servant or agent of the carrier arising out of damage to which this Convention relates, such servant or agent, if he proves that he acted within the scope of his employment, shall be entitled to avail himself of the limits of liability which that carrier himself is entitled to invoke under Article 22.

"(2) The aggregate of the amounts recoverable from the carrier, his servants and agents, in that case, shall not exceed the said limits.

"(3) The provisions of paragraphs (1) and (2) of this article shall not apply if it is proved that the damage resulted from an act or omission of the servant or agent done with intent to cause damage or recklessly and with knowledge that damage would probably result."

**17.** See, e. g., Comments of Mr. Stalder of Switzerland, in 1 *International Conference on Private Air Law, The Hague, September 1955, Minutes* 216 (ICAO Doc. 7686–LC/140 1956) (*"Mr. Stalder* (Switzerland) stated that the Swiss Delegation saw no necessity for amending the Convention by an Article 25A. However, in order to assist the courts which would have to pass judgment on cases now carefully regulated by this article, he was prepared to accept it"); Comments of Mr. Ambrosini of Italy, *id.* at 220 ("He had always thought that the Warsaw Convention regulated not only the liability of the carrier, but, at the same time, that of his servants or agents"); cf. Beaumont, *The Proposed Protocol to Warsaw Convention of 1929*, 20 J. Air. L. & Comm. 264, 270 (1953)

drafters had omitted in Warsaw, then added at The Hague (using more than a few words for the purpose) what defendants claim was always there.[18] As to this country's nonadherence, it may be argued that such post-Warsaw events are not authoritative concerning what the Convention as agreed to should be taken to mean. On the other hand, the Senate has a large hand in the business of treaty-making and a duty of knowledgeable response preceding that of the courts. The failure to adopt the Hague Protocol, considered always in the setting of apposite national policies, and in the swirl of dissatisfaction with any limitations in the Warsaw Convention, see note 11, *supra*, is a datum "relevant in ascertaining the proper construction * * * [of] the treaty's various. provisions," *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 35 (2d Cir. 1975).

4. Defendants raise several other issues in resisting this motion. First, they contend that the contract of carriage between TWA and the decedents,[19] as well as TWA's tariff provisions, filed with the Civil Aeronautics Board,[20] entitle them to the $75,000

(the proposed draft of Article 25A "would set at rest serious doubts which have been expressed in connection with Article 25 concerning the position of servants and agents of the carrier"); Comments of the Netherlands, in 2 *International Conference on Private Air Law, The Hague, September 1955*, Documents, 171 (ICAO Doc. 7686–LC/140 1956); 1 *International Conference on Private Air Law, Guadalajara, August-September 1961, Minutes* 138 (ICAO Doc. 8301–LC/149–1 1962).

18. See, e. g., Comments of Mr. Alten of Norway, 1 *International Conference on Private Air Law, The Hague, September 1955, Minutes* 214 ("The preamble of the Warsaw Convention provided that the Convention had been adopted in order to secure a uniform regulation of the conditions of carriage in regard to the documents used for such carriage and the liability of the carrier. The Convention contained no provision concerning the liability of servants or agents. * * * The servants or agents of the carrier were not parties to the contract of carriage"); Comments and Proposals of the German Federal Republic, in 2 *International Conference on Private Air Law, The Hague, September 1955, Documents* 224; cf. Comments of Mr. Pedreira of Portugal, 1 *International Conference on Private Air Law, The Hague, September 1955, Minutes* 221 ("a principle limiting

limitation because both the contract and the tariff explicitly extend the carrier's limitation of liability to cover "agents, servants and representatives" of the carrier. Reference has been made in this connection to 14 C.F.R. § 221.38(j) (1975), which provides, *inter alia*, that

"each air carrier and foreign air carrier shall publish in its tariffs a provision stating whether it avails itself of the limitation on liability to passengers as provided in Article 22(1) of the Warsaw Convention or whether it has elected to agree to a higher limit of liability by a tariff provision. Unless the carrier elects to assume unlimited liability, its tariffs shall contain a statement as to the applicability and effect of the Warsaw Convention * * *."

■ It has been established, however, by authoritative rule that the tariff provisions of an international carrier, whatever their effects in other countries, cannot impose limits of liability more stringent than those under the Warsaw Convention.[21] TWA, in its tariff, recognizes this rule:

the liability of servants or agents was useful and just, for the servant or agent deserved the same protection as the carrier"); Comments of Mr. Booth of Canada, *id.* at 218 ("the absence of such a clause would permit a complete evasion of the provisions of the Convention in regard to the limits of liability of the carriers.")

19. Paragraph 6 of the standard International Air Transport Association (I.A.T.A.) Airline ticket used by TWA, provides:

"Any exclusion or limitation of liability of carrier shall apply to and be for the benefit of agents, servants and representatives of carrier and any person whose aircraft is used by carrier for carriage and its agents, servants and representatives."

20. Passenger Rules Tariff No. R-3, Rule 16(c)(12) of TWA (C.A.B. No. 17), provides:

"Any exclusion or limitation of liability of Carrier under this tariff or the ticket shall apply to agents, servants, or representatives of the Carrier acting within the scope of their employment and also to any person whose aircraft is used by the Carrier and its agents, servants or representatives acting within the scope of their employment."

21. While the language does not convey the message with entire clarity, this prohibition

"Rules stating any limitation on, or condition relating to, the liability of carriers for personal injury or death are not permitted to be included in tariffs filed pursuant to the laws of the United States, except to the extent provided in Rule 16(B)(1) with respect to Tariff C.A.B. No. 17, any [sic] such limitation or condition in any rule herein is not a part of Tariff C.A.B. No. 17, except to the extent provided in Rule 16(B)(1) with respect to Tariff C.A.B. No. 17, filed with the Civil Aeronautics Board of the United States. Nothing in this Tariff modifies or waives any provision of the [Warsaw] Convention." [22]

The quoted exception referring to Joint Tariff Rule 16(B)(1) is no help to defendants; that Rule simply refers to Article 22(1) of the Warsaw Convention. To the extent any other limitations are included, TWA goes on to acknowledge, they are applicable only in tariffs filed in other countries.[23]

■ It is evident, in sum, that the tariff provision defendants invoke gives them no more immunity than they may have under the Warsaw Convention.

■ Defendants' arguments from the tickets decedents bought are more clearly unavailing: the ticket clearly cannot create limitations forbidden by the tariff.[24]

5. Finally, defendants argue that as corporate officers of TWA acting within the scope of their employment, they could be liable, if at all, only for misfeasance or malfeasance, not nonfeasance. The parties discuss this contention variously in terms of New Jersey and New York law without touching explicitly on the possible conflicts of law issue.

Plaintiffs, all residents of states "other than New Jersey," filed this action in New

results from 14 C.F.R. § 221.38(h), which states:

"No provision of the Board's regulations issued under this part or elsewhere shall be construed to require on and after March 2, 1954, the filing of any tariff rules stating any limitation on, or condition relating to, the carrier's liability for personal injury or death. No subsequent regulation issued by the Board shall be construed to supersede or modify this rule of construction except to the extent that such regulation shall do so in express terms."

And the C.A.B., by Order Serial No. E–8756, 19 Fed.Reg. 7387, issued November 10, 1954, required all carriers and foreign air carriers to cancel from their tariffs, on or before January 1, 1955, all rules, regulations, or provisions stating any limitation on, or condition relating to, carrier liability for personal injury or death. The effect of these rules and regulations is to ban any further restrictions to the Warsaw Convention's limitation of liability. Pratt, *Tariff Limitations on Air Carriage Contracts*, 29 J.Air.L. & Comm. 14, 20 (1963). See also Warsaw Convention, Article 23. The cited regulation, 14 C.F.R. § 221.38(j), states no more than this.

Since the C.A.B. has so provided, we need not decide whether the C.A.B. would have the power, absent explicit Congressional directive, to extend the limitations of liability for personal injury or death. See, however, Warsaw Convention, Article 23 (no limit of liability beyond that found in the Warsaw Convention). Compare *Lichten v. Eastern Air Lines, Inc.*, 189 F.2d 939 (2d Cir. 1951), with *Brady v. Roosevelt S.S. Co.*, 317 U.S. 575, 63 S.Ct. 425, 87 L.Ed. 471 (1943).

22. Passenger Rules Tariff No. R–3, Rule 2 of TWA (C.A.B. No. 17); *id.*, note to 16(C)(2).

23. TWA has stated that insofar as its tariff provides for any limitation which goes beyond the Warsaw Convention, it is included only "as part of the tariff filed with governments other than the United States," where, it is remembered, the Hague Protocol may well be in effect. Passenger Rules Tariff No. R–3, Rule 2 of TWA (C.A.B. No. 17); *id.*, note to 16(C)(2).

24. Joint Tariff, Article 18; see also 49 U.S.C. § 1373 (1970); *Tishman & Lipp V. Delta Air Lines*, 413 F.2d 1401 (2d Cir. 1969); *Lichten v. Eastern Air Lines, Inc.*, 189 F.2d 939, 941 (2d Cir. 1951); *Randall v. Frontier Airlines, Inc.*, 397 F.Supp. 840 (W.D.Ark.1975); *Berkman v. TWA, Inc.*, 209 F.Supp. 851, 853 (S.D.N.Y. 1962); *Wittenberg v. Eastern Air Lines, Inc.*, 126 F.Supp. 459 (E.D.S.C.1954); *Eastern Air Lines, Inc. v. Williamson*, 282 Ala. 421, 211 So.2d 912 (1968); *New York & Honduras Rosario Mining Co. v. Riddle Airlines, Inc.*, 3 A.D.2d 457, 162 N.Y.S.2d 314 (1st Dept. 1957), aff'd, 4 N.Y.2d 755, 172 N.Y.S.2d 168, 149 N.E.2d 93 (1958); Note, *Air-Carrier Tariff Provisions Limiting Liability for Negligence*, 70 Harv.L.Rev. 1282, 1282 (1957); Markham & Blair, *The Effect of Tariff Provisions Filed Under the Civil Aeronautics Act*, 15 J. Air. L. & Comm. 251 (1948).

Jersey, where defendants are residents. The case was thereafter transferred to this court. The complaint alleges jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1333, 46 U.S.C. § 761 *et seq.* ("Death on High Seas Act"), and general maritime law. It is not at all clear at this stage what law will be deemed applicable in determining the liability *vel non* of defendants as officers of TWA. Nor is it possible at this stage to know what the consequences of applying any particular body of law will come to be.

While New York, with varying degrees of rigor, still applies in certain situations the misfeasance-nonfeasance distinction for corporate agents, *Jones v. Archibald,* 45 A.D.2d 532, 360 N.Y.S.2d 119 (4th Dept. 1974); *Michaels v. Lispenard Holding Corp.,* 11 A.D.2d 12, 201 N.Y.S.2d 611 (1st Dept. 1960), the distinction has disappeared in other states, see, e. g., *Miller v. Muscarelle,* 67 N.J.Super. 305, 170 A.2d 437, 445–51 (A.D.), certification denied, 36 N.J. 140, 174 A.2d 925 (1961). Although TWA is headquartered in New York, it is impossible to say at this moment that New York law necessarily should control, especially when considering the interests of decedents and the policies of their respective states.

█ It is also to be noted that the nonfeasance-misfeasance distinction, itself never very clear,[25] has exceptions, even where it is found to apply, depending, *inter alia,* on the power and responsibility of the corporate officers.[26] This issue, as well as the basic factual question whether the asserted negligence constituted nonfeasance or misfeasance, depends on evidence yet to be adduced.

In conclusion, the motion to strike defendants' second affirmative defense will be granted, as the Warsaw Convention does not limit the liability of employees or agents of a carrier, and TWA's tariff does not purport to otherwise limit its, or its employees', liability.

So ordered.

---

**25.** See generally W. Prosser, *Torts* 339–40 (4th ed. 1971).

**26.** See, e. g., 3A *Fletcher Cyclopedia Corporations* § 1135 at 203 (1975):

"The rules governing liability of agents in general, to third persons, for their torts, as laid down in textbooks on the law of agency, are almost invariably applicable to the liability of corporate officers to third persons for their torts * * *. The rule of nonliability for the negligence of an agent or servant on account of nonfeasance is limited to breaches of duty owed by him to his principal, and has no application where there is a breach of duty owing by the agent himself to third persons."

See also Restatement, Second, Agency § 354; *id.,* Reporter's Notes to Sections 305–357 at 581 (Appendix).