**Eileen M. McCARTHY, Plaintiff,**

v.

**NORTHWEST AIRLINES, INC., Defendant.**

**Civ. A. No. 92–CV–11504–RCL.**

United States District Court, D. Massachusetts.

Aug. 31, 1994.

Marvin H. Greenberg, Woburn, MA, for plaintiff.

John J. Bonistalli, Law Offices of John J. Bonistalli, Boston, MA, for defendant.

## MEMORANDUM AND ORDER

LINDSAY, District Judge.

In this action the plaintiff, Eileen M. McCarthy, alleges negligence (Counts One and Two of the complaint), or alternatively, liability without fault under the provisions of the Warsaw Convention (Count Three of the Complaint), against the defendant Northwest Airlines, Inc. (the "defendant" or "Northwest"). The defendant moved for summary judgment on all counts. The plaintiff opposed that motion and, in addition, moved that summary judgment on the issue of liability be granted in her favor. As to the claims under the Warsaw Convention, the court grants the defendant's motion and denies that of the plaintiff. For reasons stated herein, the court makes no ruling at this time on the motions as they relate to the negligence claims.

## I. FACTS

The following facts appear from the pleadings, depositions, answers to interrogatories and affidavits considered in connection with the present motion.

On July 2, 1990, the plaintiff and her sister left Boston's Logan International Airport for a twenty-day trip to Japan and China. Their first stop was Tokyo, where they stayed for four days.

On July 6, 1990, they went to Narita International Airport to board a Northwest flight that would take them to Osaka, Japan. The airport was busy when they arrived, and a line had formed at the Northwest ticket counter. The women had not yet obtained their boarding passes, so they had to stand in the line.

When they reached the front of the line, they told the Northwest ticket agent that they did not think that they would make their flight. They also told the agent that they did not want to rush, and that they would take another flight if they could not, without excessive rushing, make their original flight. The agent told them that making their original flight would not be a problem. The agent proceeded hastily to check their luggage and issue boarding passes. The agent then led the two women in the direction of the customs area and a bus that would take them to the boarding area for their flight.

The plaintiff and her sister, as directed by the agent, followed the agent, who was carrying their passports and boarding passes. The agent led the women onto a descending escalator. The plaintiff, who was neither running nor walking on the escalator, felt a jerk of the escalator and fell forward onto her right knee, injuring it. She informed the agent that she was injured. The agent did not respond and did not advise the plaintiff that she could fill out a medical report. The plaintiff proceeded through customs, boarded a bus with her sister and the agent, and finally boarded the plane to Osaka.

## II. DISCUSSION

The defendant contends that the plaintiff may not recover on her claim under the Warsaw Convention because the plaintiff was not embarking or disembarking an aircraft at the time of the alleged accident. As to the negligence claim, the defendant says that the plaintiff may not recover because the defendant did not own, operate, maintain or control the area where the plaintiff was injured.

### A. The Claim Under the Warsaw Convention

Article 17 of the Warsaw Convention [1] provides that:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 U.S.C. § 1502 note; *see also Ricotta v. Iberia Lineas Aereas De Espana,* 482 F.Supp. 497, 499–500 (E.D.N.Y.1979), *affirmed* 633 F.2d 206 (2nd Cir.1980). As modified by the Montreal Agreement,[2] 49 C.A.B. 819 (1966), the Warsaw Convention limits to $75,000 an airline's liability to a passenger for bodily injury sustained "in the course of any of the operations of embarking or disembarking." *See* 49 U.S.C. § 1502 note; *Hernandez v. Air France,* 545 F.2d 279, 281 (1st Cir.1976), *cert. denied,* 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 32–33 (2nd Cir.1975), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

To impose liability on an airline under Article 17 of the Warsaw Convention, the plaintiff must show first that an accident

---

**1.** The United States is a party to the Multilateral Convention for Unification of Certain Rules Relating to International Transportation by Air concluded at Warsaw on October 12, 1929, entered into force for the United States on October 29, 1934, subject to a reservation, 49 Stat. 3000, *reprinted in* 49 U.S.C. § 1502 note.

**2.** For a fuller explanation of how the Montreal Agreement modified the Warsaw Convention, see *Hernandez v. Air France,* 545 F.2d 279, 281 n. 1 (1st Cir.1976), *cert. denied* 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977).

occurred. *MacDonald v. Air Canada*, 439 F.2d 1402, 1405 (1st Cir.1971). This means that she must show that her fall was not caused by "some internal condition", but that it "was the result of an accident." *Id.* Here the plaintiff has submitted an affidavit which attests that "as she was nearing the bottom of the escalator, the escalator jerked causing [her] to be propelled approximately six feet from the bottom of the escalator", with the result that she hit her right knee on the floor. The defendant has not submitted an opposing affidavit on this question. Thus, taking the facts in the light most favorable to the non-moving party, *F.D.I.C. v. Anchor Properties*, 13 F.3d 27, 30 (1st Cir.1994), the court determines that the plaintiff meets her burden of showing that her fall was the result of an accident.

The court must next determine as a matter of law whether the facts show that the plaintiff was "in the course of any of the operations of embarking or disembarking" at the time of her accident. *See MacDonald*, 439 F.2d at 1402. Different circuits have applied different tests to answer this question, and much debate remains concerning whether the Warsaw Convention was intended to impose liability only for accidents which occur within the physical confines of an aircraft or was intended to impose liability on carriers for accidents that occur away from the aircraft, but while the injured passenger is approaching or leaving it.

The leading test for determining whether a passenger is in the course of any of the operations of embarking or disembarking is that enunciated by the Second Circuit in *Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 32–33 (2nd Cir.1975), *cert. denied*, 429 U.S. 1124 (1977). There the court employed a flexible, tripartite test in holding that passengers were engaged in the operations of embarking, and thus, could recover from TWA for injuries they sustained as the result of a terrorist attack at an airport in Greece. The court rejected a narrow, location-based test and instead focused on three factors: (1) activity (what the plaintiffs were doing); (2) control (at whose direction); and (3) location. *Day*, 528 F.2d at 33.

In *Buonocore v. Trans World Airlines, Inc.*, 900 F.2d 8, 10 (2nd Cir.1990), the Second Circuit reaffirmed the tripartite test of *Day*, but noted that the *Day* test had been criticized for construing Article 17 too broadly in favor of liability. In ruling that Buonocore's representatives could not recover from the airline for Buonocore's death because he was not engaged in any of the operations of embarking when he died as the result of a terrorist attack at a Rome airport, the court considered: (1) the activity of the passenger at the time of the accident; (2) the restrictions, if any, on his movement; (3) the imminence of actual boarding; and (4) the physical proximity of the passenger to the gate. *Id.* at 9. The court discussed how these factors led to the imposition of liability on the airline in *Day*, but to a contrary holding in *Buonocore*:

> The first factor enunciated in *Day* is the activity of the passengers at the time of the accident. The *Day* passengers were actively engaged in preparations to board the plane. By contrast, Buonocore had only checked in at the ticket counter and was in the public area near a snack counter. The second factor is the restrictions on the passengers' movement. The *Day* passengers had been herded in line and risked missing the flight if they strayed. Buonocore had ample time to roam freely about the terminal before his flight was called. The third factor is the imminence of actual boarding. The *Day* passengers were within minutes of boarding. Buonocore's flight was to depart almost two hours later. The fourth factor is the proximity of passengers to the gate. The *Day* passengers were at the gate. Buonocore was nowhere near the gate.

*Buonocore*, 900 F.2d at 10.

The Third Circuit considers the three *Day* factors to be primarily relevant to a determination of the question of a carrier's liability under Article 17. *Evangelinos v. T.W.A., Inc.*, 550 F.2d 152, 154 (3rd Cir.1977). That court, however, "place[s] less weight upon carrier control over passengers than did the *Day* court," noting that "[w]hile control remains at least equally as important as location and activity, it is an integral factor in

evaluating both location and activity." *Id.* at 155. Finally, the court noted that "[a]nother possibly relevant factor is whether the cause of the accident is a hazard of air travel as it exists at the time of the accident, since the Warsaw Convention was concerned with such hazards." *Id.* at 155 n. 8a. The court concluded that a terrorist attack was one such hazard, and denied the airline's motion for summary judgment. *Id.*

In a pre-*Day* case, the First Circuit, construing narrowly the applicability of the Warsaw Convention, focused on the location of the plaintiff at a baggage terminal, and held that Article 17 of the Warsaw Convention was not applicable to injuries sustained by an arriving passenger who fell in the baggage pickup area of an airport, both because there was insufficient evidence that the fall was the result of an accident and because the injury did not occur during any of the operations of disembarkation. *MacDonald,* 439 F.2d at 1404–1405.

In a later case, the First Circuit explained its holding in *MacDonald,* saying:

> We do not view our holding in *MacDonald* as necessarily foreclosing the adoption of the *Day–Evangelinos* tripartite test, and we believe that the nature of a plaintiff's activity when injured, its location, and the extent to which the airline was exercising control over plaintiff at the time of the injury are certainly relevant considerations in determining the applicability of article 17.

*Hernandez v. Air France,* 545 F.2d 279, 281 (1st Cir.1976), *cert. denied,* 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977) (footnote omitted).

The court applied the *Day* tripartite test, but ultimately concluded that plaintiffs did not have a right to recover under Article 17 for injuries they sustained as a result of a terrorist attack after disembarking. *Id.* at 281.

In footnote four of its opinion the court said:

> Although the relevance of control, as opposed to activity or location, may be less apparent from the text and drafting history of the treaty ..., we think that inas-

much as the carrier's duty to protect passengers from the acts of third parties arises not from the carrier's ability to control the third party but from the relationship between carrier and passenger, the scope of article 17 should be limited to those situations where either the carrier has taken charge of passengers, or possibly where it customarily would have done so.

*Id.* at 283 n. 4 (citations omitted).

The Court also stated:

> We are persuaded that the [drafters of the Warsaw Convention] understood embarkation and disembarkation as essentially the physical activity of entering or exiting from an aircraft, rather than as a broader notion of initiating or ending a trip. Although the [drafters] did not seek to resolve the line drawing problems presented by the close cases in which the tripartite test of *Day–Evangelinos* may be useful guides for decision we think that the [drafting history implies] that the carrier is not to be held liable for all damage which might befall a traveler as he goes about various activities in the airport before or after his flight.

*Hernandez,* 545 F.2d at 283.

The facts of the instant case present the Court with "line drawing problems ... in which the tripartite test of *Day–Evangelinos* may be useful guides." *Hernandez,* 545 F.2d at 283. In the end, however, it is the First Circuit's analysis of when Article 17 applies, as explicated in the *Hernandez* and *MacDonald* cases, which controls whether liability may be imposed here.

The first factor to be considered is the plaintiff's activity at the time of the accident. Here, the plaintiff was on an escalator, en route to her flight. She had reached neither the boarding area nor any area under the exclusive control of the defendant.

The second factor is restriction on the passenger's movement. The plaintiff in this case had been instructed to follow the agent and, like the passenger in *Day,* the plaintiff risked missing her flight if she strayed. Although the agent had taken possession of the plaintiff's passport and boarding pass, there

is no indication that the plaintiff could not have retrieved these items from the agent and abandoned the mad dash to the boarding gate.

The third factor is the imminence of actual boarding. The plaintiff's flight was about to depart. The plaintiff, however, still had to pass through customs inspection and board a bus that would transport her to the plane.

The fourth factor is proximity of the passenger to the gate. As just noted, the plaintiff was en route to the gate, but still had to pass through customs and board the bus that would ultimately bring her to board the plane.

██ A consideration of all of the foregoing factors leads to the conclusion that at the time of her accident, the plaintiff was too remote from the aircraft to receive the benefit of Article 17. To reiterate the teaching of the First Circuit, the drafters of Article 17 did not intend, after all, to impose liability on an airline for all damage which might befall a traveler as he or she goes about various activities in the airport before or after a flight. *Hernandez*, 545 F.2d at 283. The defendant's motion for summary judgment on the Warsaw Convention claim is therefore granted, and the plaintiff's summary judgment motion on this claim is denied.

B. *Negligence Claim*

This brings us now to the plaintiff's negligence claim.

The plaintiff alleges that her injuries were caused by either or both of the following: the failure of Northwest to maintain the escalator in good order and the conduct of the agent in hurrying the plaintiff and her sister when they had stated to the agent that they did not wish to be rushed and would take a later flight if necessary.

The parties have briefed the negligence claim on the assumption that Massachusetts law applies to that claim. It is far from clear that that assumption is correct. Accordingly, the parties are directed to file briefs by September 20, 1994 on the choice of law

issue, and on the application of the governing law to the facts of this case.

SO ORDERED.