Julio Jose **MARTINEZ HERNANDEZ** et al., Plaintiffs, Appellants,

v.

**AIR FRANCE, Defendant, Appellee.**

No. 76–1146.

United States Court of Appeals, First Circuit.

Submitted June 8, 1976.

Decided Nov. 19, 1976.

Stanley Feldstein, San Juan, P. R., and Nachman, Feldstein, Gelpi, Toro & Hernandez, San Juan, P. R., on brief for appellants.

William J. Junkerman, New York City, Vicente M. Ydrach, Hato Rey, P. R., Randal R. Craft, Jr., and William F. Martin, Jr., New York City, on brief for appellee.

Before COFFIN, Chief Judge, McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

■ This case arises out of an act of terrorism which occurred on May 30, 1972, in the baggage retrieval area of the terminal building at Lod International Airport located near Tel Aviv, Israel. Plaintiffs-appellants seek damages from defendant air

carrier for death and personal injury, asserting that under the Warsaw Convention, as modified by the Montreal Agreement,[1] the defendant is liable without regard to fault for damages sustained in the attack. This is an interlocutory appeal, 28 U.S.C. § 1292(b) (1970), from the district court's dismissal of plaintiffs' Warsaw Convention claims. The single issue presented is whether the attack occurred while the passengers were disembarking within the meaning of article 17 of the Convention, which reads as follows:

"The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking."

Because the precise circumstances surrounding the terrorist act of May 30, 1972 are highly relevant to our disposition, we reproduce the pertinent portion of the district court's careful summation of the facts:

"[Plaintiffs] were members of a large group of Puerto Rico tourists traveling on defendant Air France's Flight No. 132 to Tel Aviv. Flight No. 132 originated in New York, with intermediate stops at Paris and Rome. Three Japanese, in the service of a Palestinian terrorist organization, boarded the plane at Rome. On arrival at Lod Airport, the plane came to a halt about one-third to one-half mile from the Terminal Building. The passengers descended movable stairs to the ground and then walked or rode on a bus to the terminal. There, they presented

their passports for inspection by Israeli immigration officials and then passed into the main baggage area of the terminal. While the passengers were awaiting the arrival of the last baggage from the plane, the three Japanese terrorists removed their luggage from the conveyor belt, produced submachine guns and hand grenades, and opened fire upon persons in the baggage area, killing or wounding many, including plaintiff and plaintiffs' decedents." *In re Tel Aviv*, 405 F.Supp. 154, 155 (D.P.R.1975).

The district court, citing our decision in *MacDonald v. Air Canada*, 439 F.2d 1402 (1st Cir. 1971), as a controlling precedent, held that the attack did not occur during disembarkation. In *MacDonald* we held that article 17 of the Warsaw Convention was not applicable to injuries sustained by an arriving passenger who fell in the baggage pickup area of an airport, both because there was insufficient evidence that the fall was the result of an accident and because the injury did not occur during disembarkation. 439 F.2d at 1404–05.

"If these words are given their ordinary meaning, it would seem that the operation of disembarking has terminated by the time the passenger has descended from the plane by the use of whatever mechanical means have been supplied and has reached a safe point inside of the terminal . . . ." *Id.* at 1405.

Other precedents concerning the application of article 17 to various factual situations involving arriving passengers support this reading. The phrase "operations of . . . disembarking" has been held not to cover injuries sustained where a passen-

**1.** The Convention for Unification of Certain Rules Relating to International Transportation by Air, the Warsaw Convention, *done* Oct. 12, 1929, 49 Stat. 3000, *reprinted in* 49 U.S.C. § 1502 note (1970), was the product of two international conferences held in the 1920's to establish uniform rules relating to air carriage documents and liability. Air carrier liability for death and bodily injury of passengers, article 17, was limited in amount to proven damages up to approximately $8300, article 22, with a rebuttable presumption of carrier negligence, article 20. Dissatisfaction with the low

liability limit culminated in the American notification of denunciation on November 15, 1965. A compromise was reached, the Montreal Agreement of 1966, *see* 44 C.A.B. 819 (1966), *reprinted in* 49 U.S.C. § 1502 note (1970), and the denunciation notice was withdrawn. The air carriers agreed, pursuant to article 22(1), to raise the liability limit to $75,000 and to waive the due care defense. The result is a strict liability cause of action for damages within the scope of article 17. *See generally*, Lowenfeld & Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv.L.Rev. 497 (1967).

ger was hurt by a conveyor belt in the baggage pickup area, *Klein v. KLM Royal Dutch Airlines*, 46 A.D.2d 679, 360 N.Y.S.2d 60 (1974), fell on an escalator after leaving the plane via a jetway but before reaching the health, immigration, baggage, and customs stations, *Felismina v. Trans World Airlines, Inc.*, 13 Av.Cas. 17, 145 (S.D.N.Y. 1974), or fell over construction debris in an open air customs area while walking from the plane to the terminal, *Mache v. Air France*, [1967] Rev. Fr. Droit Aerien 343 (Cour d'Appel, Rouen), *aff'd* [1970] Rev. Fr. Droit Aerien 311 (Cour de Cassation).

Plaintiffs-appellants urge that *Mac-Donald* should be reexamined in light of recent decisions involving the applicability of article 17 to injuries sustained in a terrorist attack on departing passengers. *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975), *cert. denied*, — U.S. —, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Evangelinos v. Trans World Airlines, Inc.*, (3d Cir. May 4, 1976), *petition for rehearing en banc granted*, June 3, 1976. Both of these cases involved an August 5, 1973 terrorist attack in which passengers departing from Athens were set upon as they were lining up for security check and boarding at the point of departure from the terminal to the aircraft, under the direction and supervision of employees of the carrier. Focusing on the activity in which the passengers were engaged, their location, and the extent to which they were under the control of the carrier, the *Day* and *Evangelinos* courts held that the attack occurred during embarkation and thus imposed liability on the carrier. We do not view our holding in *MacDonald* as necessarily fore-

closing the adoption of the *Day-Evangelinos* tripartite test,[2] and we believe that the nature of a plaintiff's activity when injured, its location, and the extent to which the airline was exercising control over plaintiff at the time of injury are certainly relevant considerations in determining the applicability of article 17. On the facts of this case, however, the application of these criteria require the conclusion that plaintiffs did not have a right to recover under article 17.

Considering first the passengers' activity, we note that at the time of the attack the passengers had already emerged from the aircraft, descended the stairs from the plane to the ground, traveled via bus or foot from the plane to the terminal, and presented their passports to the Israeli authorities. On these facts we do not believe it can be said that the passengers were still engaged in any activity relating to effecting their separation from the aircraft. All that remained to be done before the passengers left the airport was to pick up their baggage. We observe that passengers, who either carry no luggage or carry their luggage on the plane, will have no occasion to retrieve their baggage. It hardly seems, therefore, that such activity can constitute a necessary step in becoming separated from a plane.[3] The passengers' location also militates against article 17 coverage in this case since the attack occurred inside the terminal building located approximately one-third to one-half mile from the point where the aircraft was parked.

We also believe that the control factor weighs against holding the carrier lia-

---

2. Both the *Day* court, 528 F.2d at 34 n. 8, and the *Evangelinos* court, slip opinion at 6, suggested that the disembarkation situation was distinguishable.

3. Appellants suggest that "the operations of . . . disembarking" continue until the passengers retrieve their baggage, terming this activity "the last contact between carrier and passenger," and noting that under article 18, a carrier's liability for damage to baggage extends until the baggage is retrieved. *See* article 18. We think the drafting history rebuts

any suggestion that the liability for personal injury and that for damages to baggage are necessarily identical in scope. As we note *infra*, the framers rejected a rule imposing aerodrome to aerodrome liability for personal injury. The history, moreover, indicates that the questions of baggage liability and personal injury liability were intended to be absolutely distinct, *see* Minutes, Second International Conference on Private Aeronautical Law, October 4–12, 1929, Warsaw, p. 72 (R. Horner & D. Legrez transl. 1975), and, for that reason, were treated in separate articles.

ble.[4] In sharp contrast to the factual situation in *Day* and *Evangelinos*, the passengers here were not segregated into a group at the direction of airline employees. There is no indication that airline personnel were dictating to the passengers how they were to go about retrieving their baggage or leaving the terminal.[5] Rather, the passengers appear to have been "free agents roaming at will through the terminal." *Day, supra,* 528 F.2d at 33. Thus we conclude that this tragedy did not occur during disembarkation.

Our review of the drafting history of the Convention reinforces our conclusion that article 17 does not cover this case. At the 1929 Warsaw conference the delegates had before them a draft prepared by a committee of experts, Comite Internationale Technique d'Experts Juridique Aeriens, CITEJA, which provided that the period of carriage, and hence of carrier liability, extended

"from the moment when the travelers, goods or baggage enter in the aerodrome of departure, up to the moment when they leave the aerodrome of destination . . . ." Minutes, *supra* note 3, at 67–68 [hereinafter "Minutes"].

This proposal encountered opposition and provoked debate among the delegates on the proper scope of carrier liability. The discussion of liability for passengers centered on two proposals: the initial aerodrome to aerodrome principle and a less well articulated, more restrictive, view variously expressed as "from the moment when the travelers have boarded", Minutes 71, or "when [the passenger] embarks on the aircraft", Minutes 82. Mr. Ripert of France advanced the view that it was pointless to seek a definitive formula and therefore the text should

"employ a general formula—'during air carriage'—in leaving to the courts the duty of deciding in each case if one is within the contract of carriage." Minutes 73.

Sir Alfred Dennis of Britain proposed that votes be taken on the "questions of principle" concerning carrier liability and that the matter be submitted to the drafting committee. Minutes 80. This proposal was adopted, and in the vote on liability for passengers the CITEJA draft was rejected in favor of the more restrictive view.[6] Minutes 83. The drafting committee produced the current language of article 17, "on board the aircraft or in the course of any of the operations of embarking or disembarking", and this text was adopted without further discussion. Minutes 166.

While it is true that this drafting history does not determine the precise meaning of article 17, we think it does illuminate the intention of the Warsaw Convention drafters. We are persuaded that the delegates understood embarkation

---

4. Although the relevance of control, as opposed to activity or location, may be less apparent from the text and drafting history of the treaty, *but see* Remarks of the French delegate, Minutes, *supra* note 3 at 73 (the problem regarding the scope of liability for passengers "arises from the fact that the traveler has his independence"), we think that inasmuch as the carrier's duty to protect passengers from the acts of third parties arises not from the carrier's ability to control the third party but from the relationship between carrier and passenger, the scope of article 17 should be limited to those situations either where the carrier has taken charge of the passengers, or possibly where it customarily would have done so, *see generally,* Restatement (Second) of Torts § 314A (1965); Harper & Kime, *The Duty to Control the Conduct of Another,* 43 Yale L.J. 886, 898–904 (1934).

5. It is true that there were Air France employees on hand at the terminal, but their job appears to have been to welcome and assist the passengers, not to prescribe procedures which passengers were obliged to follow.

6. The British delegate summed up the "question of principle" which could be put to a vote as follows:

"[A]s regards travelers, does liability begin, as it said in the draft, upon the entrance into the aerodrome of departure, or does it begin when the traveler is on board the aircraft?" Minutes 80.

Similarly, the Brazilian delegate stated:

"It's a question of saying, whether the liability of the carrier begins as soon as the traveler enters into the aerodrome, which is a public place, or when he embarks on the aircraft." Minutes 82.

and disembarkation as essentially the physical activity of entering or exiting from an aircraft, rather than as a broader notion of initiating or ending a trip. Although the delegates did not seek to resolve the line drawing problems presented by close cases—cases in which the tripartite test of *Day-Evangelinos* may be useful guides for decision—we think that the rejection of the CITEJA draft does imply that the carrier is not to be held liable for all damage which might befall a traveler as he goes about various activities in the airport before or after his flight.[7]

We recognize that an argument can be advanced for holding the carrier liable in cases such as the one at bar based on modern tort law theories. It might be thought proper to hold the carrier liable as a means of distributing among all air travelers the losses occasioned by tragedies such as that giving rise to the present case. *See Day, supra*, 528 F.2d at 34. We are not unsympathetic to this approach. But, if its application is not to do violence to the history and language of the Warsaw Convention, there should, it seems to us, be a close logical nexus between the injury and air travel per se.

A fundamental premise of the argument for expanding carrier liability in this case is that the risk of death or injury in a terrorist attack is appropriately regarded as a characteristic risk of air travel. *Cf. Day*, 528 F.2d at 37–38; *Evangelinos*, slip opinion at 7. We do not think that this can be said of the sort of senseless act of violence involved in this case. The risk of violence at the hand of zealots is all too present in any public place whether it be a bank, courthouse, university campus, an Olympic village, or airport. Unlike the risk of hijacking, *see Husserl v. Swiss Air Transport Co.*, 351 F.Supp. 702, 706–07 (S.D.N.Y.1972), *aff'd per curiam*, 485 F.2d 1240 (2d Cir. 1973), where the aircraft and the fact of air travel are prerequisites to the crime,[8] we think the risk of a random attack such as that which gave rise to this litigation is not a risk characteristic of travel by aircraft, but rather is a risk of living in a world such as ours. *See Evangelinos, supra* (Seitz, C. J., dissenting) (slip op. at 3).

We observe that to expand carrier liability under article 17 to include all terrorist attacks at airports would produce anomalous results. Under article 17, only passengers could have a right to recover. It is likely, however, that nonpassengers would be injured by attacks which occur in locations such as baggage retrieval areas. To give passengers who are so injured a strict liability remedy against the carrier—who, unlike the terminal operator, presumably has no control over the situation—but to relegate the nonpassengers to their remedies under local law, would be odd indeed. It would seem to be more rational in this grey area, not clearly involving disembarking, to treat passengers and nonpassengers alike. This would mean leaving them to the remedies of local law. These, at least in most cases, would not be illusory. Moreover, contemporary theories of cost allocation may well be reflected in the provisions of local law.

We hold that on the particular facts of this case, where the passengers were waiting for their baggage inside the terminal building, had left the aircraft and its immediate vicinity, and were no longer acting at the direction of the carrier, the process of

---

7. We note that the hypothetical cases which the delegates posed as problems concerned such cases as accidents occurring as one stepped onto the stairs leading to the aircraft, Minutes 78, 81, or after boarding but before takeoff, Minutes 74, 77. By contrast there was no doubt that injuries sustained, for example, while eating in an airport restaurant, Minutes 72, walking through the airport, Minutes 73, 75, or while walking through town during a stopover, Minutes 80, would not be covered.

8. The distinction between the hijacking situation and the sort of random attack involved in this case may at times be difficult to draw. We note, for example, that the terrorists who perpetrated the crimes at the Athens airport involved in the *Day* and *Evangelinos* cases took hostages and demanded an aircraft with which to escape after they carried out the attack on passengers waiting in the transit lounge. *See Day v. Trans World Airlines, Inc.*, 393 F.Supp. 217, 219 (S.D.N.Y.), *aff'd*, 528 F.2d 31 (2d Cir. 1975).

disembarkation had been completed and article 17 of the Warsaw Convention, therefore, is not applicable.

*Affirmed.*

McENTEE, Circuit Judge (concurring).

I concur in the result reached by the court and in its reasoning to the extent that it applies the criteria described in *Day v. Trans World Airlines, Inc.*, 528 F.2d 31 (2d Cir. 1975), *cert. denied*, —— U.S. ——, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).[1] That opinion suggested that claims under Article 17 of the Warsaw Convention are not to be resolved in terms of a simple location test (where the injury occurred), but rather by application of "a tripartite test based on activity (what the plaintiffs were doing), control (at whose direction) and location." *Id.* at 33. I believe that this tripartite test represents a reasonable and flexible basis for analyzing Article 17 cases, because it is consistent both with the terms of the Convention and with the realities of modern air travel. In my opinion, the Second Circuit's holding concerning the embarkation provision of Article 17 is equally applicable to disembarkation cases:

> "We are of the view that the words 'in the course of any of the operations of embarking' do not exclude events transpiring within a terminal building. Nor, do these words set forth any strictures on location. Rather, the drafters of the Convention looked to whether the passenger's *actions* were a part of the operation or process of embarkation . . . ." *Id.* at 33 (footnote omitted).

Examining the instant claim in the light of this tripartite test, I am persuaded that Air France was no longer in real *control* of the passengers' activity when the terroristic attack took place.[2] Although, when viewed in terms of the other two factors, this case presents a close question, I believe that the airline's control was so exiguous or even

non-existent that I do not think that Article 17 applies. For these reasons, I concur in the judgment of the court.

---

1. *See also Evangelinos v. Trans World Airlines, Inc.*, No. 75–1990 (3d Cir., May 4, 1976), *petition for rehearing en banc granted*, June 3, 1976.

2. In my opinion, a terroristic attack should be subjected to the same analysis for Article 17 purposes as any other tortious act. Such an attack is one of the risks of modern air travel, and the airlines would be liable should the attack occur "in the course of any of the operations of embarking or disembarking."