NORTHERN TRUST COMPANY *et al.*, Ex'rs of the Estate of Richard Nardi, Deceased, Plaintiffs-Appellees, v. AMERICAN AIRLINES, INC., Defendant-Appellant.

First District (5th Division)   No. 83—1831

Opinion filed June 14, 1985.—Modified on denial of rehearing March 31, 1986.

SULLIVAN, J., dissenting.

Peterson, Ross, Schloerb & Seidel, of Chicago (Michael M. Lane and Kathleen O'Connor, of counsel), for appellant.

Eugene I. Pavalon, of Asher, Pavalon, Gittler, Greenfield & Segall, Ltd., of Chicago (Gary K. Laatsch, John F. Ward, and Cooney & Stenn, of counsel), for appellees.

JUSTICE PINCHAM delivered the opinion of the court:

This appeal arises from a jury verdict in favor of plaintiffs, executors of the estate of Richard Nardi, following Nardi's death due to congestive heart failure while a passenger on defendant's plane from Acapulco, Mexico, to Chicago. The trial in the circuit court of Cook County was on plaintiffs' two-count complaint which alleged that defendant was negligent. The pertinent facts follow.

The evidence presented at trial revealed that Richard Nardi was 52 years old and resided in Western Springs, Illinois, with his wife and three children. Nardi was treated by Dr. Edward A. Newman of Chicago between July 11, 1956, and December 12, 1975, for heart and heart-related ailments. During that period, at Dr. Newman's direction, Nardi was hospitalized on the following three occasions. He was hospitalized from December 15, 1972, to December 23, 1972, for complaints of upper gastric and chest pain and for evaluation of gastrointestinal or cardiac pathology. Nardi was examined in the cardiac unit, but no pathology was found. From August 19, 1975, to September 23, 1975, he was hospitalized for subacute bacterial endocarditis, an infected heart valve. Two weeks later, he was readmitted, on October 10, 1975, and was hospitalized until October 19, 1975, for chest pain. Thereafter, he continued to see Dr. Newman.

In December 1975, Nardi planned a family trip to Acapulco. Flight reservations were made on American Airlines for January 1, 1976, with a return for January 7, 1976. Their tickets were issued to them on December 16, 1975.

On the morning of their expected departure, January 1, 1976, Nardi awoke with a cough. He called Dr. Newman. The family departed as planned. During the flight to Acapulco that morning, Nardi did not have any problems. At the Acapulco Princess Hotel, where the Nardis stayed, Nardi continued to cough during the remainder of the day and he was tired. That night, he continued to cough, was restless and could not sleep.

The following morning, Nardi again awoke with a cough and was tired. With Mrs. Nardi, he went to their hotel medical office, where Nardi saw Dr. Bello, a staff physician, who gave him cough medicine. During the day Nardi continued to cough, but he walked around the hotel and was in the swimming pool. That night he continued to cough and could not sleep.

On January 3, Nardi again saw Dr. Bello at the hotel medical office. Dr. Bello gave Nardi an antibiotic and more cough medicine. Nardi talked to Dr. Bello again that afternoon. That night, Nardi could not sleep well and continued to cough. Thereupon, Nardi called Dr. Newman in Chicago.

On January 4, Nardi continued coughing and returned to Dr. Bello that morning. At 4 p.m., after spending his time at the pool or in his room, Nardi saw Dr. Louis Luhrs Eigkelboom, an Acapulco cardiologist, who came to the hotel at Dr. Bello's request. Dr. Eigkelboom examined Nardi and gave him an electrocardiogram. Dr. Eigkelboom's diagnosis was heart failure and the possibility of an acute infarction. He injected Nardi with a diuretic and gave him nitroglycerin pills for the pressure in his chest and isorbid pills to relieve the pain and expand his coronary arteries. After seeing Dr. Eigkelboom, Nardi talked to Dr. Bello. Nardi then again telephoned Dr. Newman in Chicago. He also telephoned his business office in Chicago and arranged to be met at O'Hare airport and driven to Michael Reese Hospital.

During the afternoon of January 4, Mrs. Nardi called defendant airlines to make reservations for the family on the next flight from Acapulco to Chicago. There was only one first-class seat available on the next flight, January 5, 1976, Flight 104, and she booked that seat for Nardi. Mrs. Nardi planned to leave with the children on the next flight that could accommodate them.

On the night of January 4, Nardi remained in his hotel room. Nardi continued to cough and was restless, but did not complain of pain. At 11 p.m., Mrs. Nardi called the house physician, who came to their room. Neither Nardi nor his wife went to bed. Nardi paced the room and coughed.

At 7 a.m. on January 5, Dr. Eigkelboom came to Nardi's hotel room. He examined Nardi and found that he was anxious and experiencing congestive heart failure. He administered a second electrocardiogram and diagnosed Nardi as having heart failure caused by a myocardial infarction.

Dr. Eigkelboom gave Nardi injections of digitalis, a diuretic, and bottles of nitroglycerin and isorbid. He gave Nardi the electrocardiogram sheets of January 4 and 5. Mrs. Nardi told Dr. Eigkelboom that she had been in contact with Dr. Newman in Chicago.

Later, during the morning of January 5, Mrs. Nardi called Nardi's business office in Chicago and asked that Dr. Newman be contacted for instructions for the return flight from Acapulco to Chicago. She was put on hold and was subsequently told that Dr. Newman had been contacted and had approved the use of oxygen for Nardi on the

flight but doubted that Nardi would need it. She was also advised that Nardi would be met at O'Hare Airport in Chicago with a wheelchair and that arrangements had been made for his admission to Michael Reese Hospital upon his arrival. Mrs. Nardi left the children in the hotel with a babysitter and accompanied her husband in a taxi from their hotel to the airport.

The Nardis arrived at the Acapulco airport on January 5 at about 8:45 a.m. Mrs. Nardi asked a skycap for a wheelchair, in which Nardi was wheeled to the American Airlines ticket counter. Mrs. Nardi told the agent that Nardi was ill, and Nardi was preboarded. It was the airline's practice to first board ill and disabled passengers. Nardi was wheeled to the DC-10 aircraft, but walked up the boarding stairs. Mrs. Nardi also boarded and they were met inside the doorway by Claire Bischofhausen, an American Airlines flight attendant. Nardi walked to his seat unassisted. When he sat down, he was winded and perspiring. Mrs. Nardi told Bischofhausen she did not think that Nardi would need oxygen although a doctor had approved his use of it. When Mrs. Nardi deplaned, Nardi was not in distress and was breathing normally. Prior to takeoff, Betty Westberry, the senior flight attendant, talked to Bischofhausen and to Nardi and then advised flight Captain Brownloe Whitehead that Nardi had been preboarded. When Westberry left Nardi, he was "breathing normal" and his color was "good."

Flight 104 departed Acapulco at 9:45 a.m. During the flight, Captain Whitehead discovered that the aircraft was losing fluid in the number three hydraulic system, which would affect the flight controls of the aircraft but not the engines. There was no need to prepare for an emergency landing.

The aircraft began its descent to Mexico City to board additional passengers. As Westberry approached her seat for landing, she noted that Nardi was leaning forward in his seat, perspiring and having difficulty breathing. Westberry immediately obtained ice water and towels and bathed Nardi with them while another flight attendant placed an oxygen mask over Nardi's nose and mouth.

During the taxi of the aircraft to the terminal, Westbury informed Captain Whitehead that Nardi was on oxygen. Bischofhausen asked Nardi how he was feeling and if he wanted medical help. Nardi said he was breathing better with oxygen and told Bischofhausen he did not want to leave the aircraft. When the aircraft reached the terminal, Nardi told his friend, Lee Flaherty, who also was a passenger in the first-class section, that he was not feeling well and was returning to Chicago to see his doctor. Nardi was pale but his speech was coher-

ent and rational.

Before Captain Whitehead left the aircraft, he stopped at Nardi's seat, knelt down and "chatted with [Nardi], some consoling words *** something like that." Captain Whitehead did not notice anything unusual about Nardi's color. He observed that Nardi's facial color was good and that his breathing was normal with the oxygen. Nardi continued on oxygen on the recommendation of Captain Whitehead, who thought that Nardi's problem was related to the altitude of Mexico City. Nardi pulled his oxygen mask from his nose and mouth when he talked to Captain Whitehead.

Flight attendants Bischofhausen and Westberry continued to administer oxygen and to check on Nardi, whose condition appeared satisfactory to Westberry. Westberry "would stop by occasionally and pat him on the shoulders and say how are you doing, is everything okay, and I always got a response of yes." Whitehead and Bischofhausen were concerned, however, that the aircraft's oxygen supply would be depleted and were advised by airline agents that oxygen was available at the airport terminal's medical clinic. After approximately an hour, American Airlines agent Jose Galindo, Bischofhausen, Westberry and Captain Whitehead talked to Nardi and attempted to convince him that he should be taken in a wheelchair to the medical clinic. Nardi protested leaving the aircraft. He was persuaded to go only after he was assured that he would be returned to the aircraft to continue his flight home when the aircraft was repaired.

The medical clinic at Mexico City airport was operated by the Mexican government. Donald Fraser, the manager of American Airlines at Mexico City, sent his secretary, Silvia Ridolfi, to the medical clinic to translate for Nardi. Nardi was conscious and coherent but his color by this time was abnormal and he was having difficulty breathing without oxygen. Oxygen was brought to the clinic from American Airlines and administered to Nardi because the oxygen tanks in the clinic would not work. Dr. Penechay, a physician at the clinic, examined Nardi and determined that Nardi should be taken to a hospital, but Nardi refused and insisted upon being returned to the aircraft. Nardi said that he would not go to "any damn Mexican hospital." Fernando Cruz, an American Airlines supervisor, then asked Dr. Penechay if Nardi could continue on the flight and Dr. Penechay said yes. Nardi, while still using oxygen, was then returned to the aircraft in a wheelchair.

Shortly after Nardi returned to the aircraft, and while the aircraft was still at the terminal, Nardi was examined at the request of Captain Whitehead by Dr. Michael V. Miller, a thoracic vascular surgeon

who boarded the aircraft at Mexico City. Dr. Miller talked with Nardi, took his pulse, found him to be mildly cyanotic (bluish in color) and that his breathing was a bit labored. Nardi was still using oxygen. Whitehead and Bischofhausen asked Dr. Miller if Nardi could continue the flight to Chicago and Miller told them that Nardi could do so. A few moments later, Nardi complained that he was having severe abdominal pains. When asked whether he had any medication with him, Nardi took a bottle of nitroglycerin out of his pocket and a pill was given to him. According to Bischofhausen, "shortly after [that] he stood up and started grabbing in the stomach area. He kept saying, 'oh doctor, I'm in such pain.'" At that time, Dr. Miller again felt his stomach, took his pulse and said that Nardi was "losing ground at that point." Dr. Miller concluded that the situation "demanded reassessment" and advised that Nardi could not make the flight and had to be taken to a hospital. Bischofhausen then instructed a ground agent to call for an ambulance.

Nardi was removed from the aircraft in a wheelchair while still on oxygen. As Nardi was taken off the aircraft, another doctor, Dr. Mijanjos, a cardiovascular surgeon who was also a passenger on the aircraft, assumed control. Mijanjos used tourniquets and ordered lasix, a diuretic, to be purchased by a ground agent. Nardi was in the airport terminal approximately 20 to 30 minutes before the ambulance arrived and took him to the British Cowdray Hospital in Mexico City. The trip took approximately 35 minutes. En route, Nardi was given oxygen. A medical team at the hospital had been alerted and administered medical aid to him, including electrical shock. The physicians in the hospital emergency room were unable to save Nardi, and he was later pronounced dead. An autopsy recorded the cause of death as an organic heart disease.

A year later, on April 13, 1977, plaintiffs filed a two-count complaint in the circuit court of Cook County. Count one alleged, *inter alia*, that on January 3, 1976, the day Nardi purchased his ticket, defendant was informed that Nardi was "in ill health" and would require careful attention as a passenger, that defendant failed to remove Nardi from the aircraft when it became apparent that the stopover in Mexico City would be considerably longer than anticipated, and that defendant negligently failed to immediately transport Nardi to the Mexico City hospital when it became apparent that Nardi's condition required medical treatment which could only be rendered at the hospital. Count two of the complaint was withdrawn.

Defendant's amended answer asserted as an affirmative defense that the provisions of the Warsaw Convention (Convention) and the

Montreal Agreement (which modified the Convention by raising the liability limit for air carriers and waiving the defense of due care) apply to this case and exclusively govern the rights and liabilities of the parties.[1] Defendant further alleged that Nardi was contributorily negligent in not following a physician's recommendation to enter a hospital in Acapulco and not fly to Chicago. Defendant denied any liability and denied that plaintiffs were entitled to judgment in "any amount of money whatsoever."

In reply to the affirmative defense, plaintiffs denied that the international treaty limited defendant's liability. Defendant filed a motion for partial summary judgment on the ground that the Convention and Montreal Agreement apply to the facts of this case and limit defendant's liability, if any, to provable damages of $75,000. The motion was denied. The trial court subsequently ruled that in this case, there was no "accident" as that term is used in article 17 of the Convention, and that the limit of monetary liability provided by the Convention and the Montreal Agreement therefore did not apply to this case.

The jury found that Nardi was 60% contributorily negligent and awarded plaintiffs $1,030,212 in damages. Following the denial of defendant's post-trial motion, defendant appealed.

■ We first agree with the trial court's determination that no accident occurred in this case. An accident has been defined as an unusual or unexpected happening. An event or occurrence is not an accident if it results solely from the state of health of the passenger and is unconnected with the flight. (*Warshaw v. Trans World Airlines, Inc.* (E.D. Pa. 1977), 442 F. Supp. 400, 412.) In the case at bar, Nardi's ill health (heart condition) was an inherent weakness or disability and was not the result of an unusual or unexpected happening which was connected with the flight. We therefore see no reason to disturb the trial court's ruling on this issue.

■ We turn next to the question of whether an airline passenger who died from a preexisting physical ailment during a flight stopover has any cause of action against the air carrier for the carrier's alleged negligence when no accident occurred. A recent case, *Abramson v. Japan Airlines Co.* (3d Cir. 1984), 739 F.2d 130, decisively addresses and decides this question. In *Abramson*, the plaintiff was on an inter-

---

[1]The Warsaw Convention is the popular name for the Convention for the Clarification of Certain Rules Relating to International Transportation by Air (49 Stat. 3000, Treaty Series No. 876; 49 U.S.C.A., note following sec. 1502 (1976)), adhered to by the United States in 1934, as modified by the Montreal Agreement.

national flight when he suffered an attack from a preexisting paraesophageal hiatal hernia. His subsequent complaint alleged that the airline was liable under the Warsaw Convention and that it was further liable for the airline employees' negligent and wilful misconduct which allegedly aggravated his hernia. The District Court granted the airline's motion for summary judgment on the ground that the Warsaw Convention was inapplicable since there was no accident. The appeals court affirmed that ruling. The court further ruled that when the Convention is inapplicable, an airline's liability to a passenger may be established by traditional common law rules. Thus, the court held, since article 17 of the Warsaw Convention was inapplicable because there was no accident, plaintiff's alternative theories of recovery against the airline under State law were not precluded and the trial court erred when it failed to consider plaintiff's common law negligence and wilful misconduct claims. (739 F.2d 130, 134.) The cause was reversed and remanded.

Other decisions are instructive on the question of whether a claim can be brought against an airline on other grounds when the Warsaw Convention is inapplicable. In *Husserl v. Swiss Air Transport Co.* (S.D.N.Y. 1975), 388 F. Supp. 1238, 1246, the court stated that "injuries not comprehended by the terms of the Convention" may give rise to causes of action not subject to any of the conditions or limits of the Warsaw Convention. The court further stated that, "It would have been a simple matter to preclude all relief for *** unenumerated types of injuries; but no article to that effect was incorporated [in the Convention]." In an earlier proceeding in the same case, *Husserl v. Swiss Air Transport Co.* (S.D.N.Y. 1972), 351 F. Supp. 702, 706, the court concluded:

"*** [T]he Convention does not 'exclusively regulate' the relationship between passenger and carrier on an international flight, but rather sets limits on and renders uniform certain of the aspects of that relationship. *** Thus, it would seem to follow that if the Convention 'applies,' it applies to limit—not eliminate—liability; *if it does not apply, it leaves liability to be established according to traditional common law rules.*" (Emphasis added.)

The court in *Hernandez v. Air France* (1st Cir. 1976), 545 F.2d 279, 284, also considered this issue and determined:

"To give passengers who are so injured [by a terrorist attack in the air terminal] a strict liability remedy against the carrier *** but to relegate the nonpassengers [in the air terminal] to their remedies under local law, would be odd indeed. It would seem to

be more rational in this grey area *** to treat passengers and nonpassengers alike. *This would mean leaving them to the remedies of local law.*" (Emphasis added.)

We conclude that article 17 of the Convention does not apply to this case because there was no accident, but that plaintiffs may bring a cause of action against the air carrier under traditional common law rules. It is unnecessary for us to decide plaintiffs' contention that the Warsaw Convention is unconstitutional inasmuch as the Convention is inapplicable to this case.

■■ Defendant next argues that the trial court erred by excluding from the jury the testimony of Drs. Eigkelboom and Newman about the warnings they each gave Nardi against flying. Plaintiffs, on the other hand, contend that because this cause of action did not arise out of an accident, Nardi was only required to exercise ordinary care for his safety at and after the time he became a passenger on the flight. Therefore, plaintiffs assert, the testimony of Nardi's Chicago and Mexico physicians and other persons concerning Nardi's physical condition, his knowledge of his physical condition and his conduct *before he became a passenger* was irrelevant.

The evidence deposition of Dr. Eigkelboom, taken in Acapulco, was filed by defendant as part of the trial record. Prior to trial, plaintiffs presented a motion *in limine* to prevent defendant from making any reference before the jury to conversations between Dr. Eigkelboom and Nardi in which Dr. Eigkelboom recommended that Nardi be admitted to a hospital and not fly home. In support of their motion, plaintiffs argued that the preflight statements to Nardi by Drs. Eigkelboom and Newman should be excluded as irrelevant to the issue of Nardi's alleged contributory negligence because Nardi's duty to use ordinary care for his own safety began only when he became a passenger on the flight. We here note that the dissent correctly points out that Eigkelboom's deposition testimony, comprising 37 pages was read by defense counsel to the jury. However, Eigkelboom's complete deposition testimony was not read to the jury, pursuant to the plaintiff's *in limine* order. The excluded testimony of Eigkelboom of his recommendations to Nardi on January 4, 1976, the day before the flight, was as follows:

"Q. Doctor, did you recommend any further medical procedures to Mr. Nardi?

A. Yes.

Q. What were they?

A. I recommend him many times that it was very important that we obtain of him laboratory tests and that he come in the hospital.

Q. Doctor, were those laboratory tests performed?

A. No, he don't accept it."

Also excluded was Dr. Eigkelboom's testimony regarding his advice to Nardi on January 5, 1976, the day of the flight. On that day, Dr. Eigkelboom administered a second electrocardiogram and observed that there were adverse changes from the electrocardiogram of the previous day. His deposition testimony was:

"Q. And, doctor, did you make any recommendations to Mr. Nardi?

A. Yes, of course.

Q. Would you tell us what those recommendations were?

A. The same recommendations of the—of one day before and I insisted to him that he don't can travel too, but he insists me that he preferred to go to the United States to his doctor."

The trial court also precluded defendant from presenting evidence of what Dr. Edward A. Newman told Nardi in Mexico concerning the conditions under which Nardi could fly to Chicago. As a result of the court's ruling, the jury did not hear the following testimony, which was given by Newman during defendant's offer of proof:

"Q. Who did you speak to?

A. I spoke—I don't remember who. I received a call from Mexico, the exact date, I think it was a couple of days before he [Nardi] left Mexico. ***. *I spoke to him either the 3rd or the 4th, I'm not sure.*

*I got a call from Mexico stating that he was not well. He was sweating, had vague symptoms, shortness of breath, and I said see a doctor down there immediately.* Immediately. And *I said if he says you are okay, I said, or not that good, get back here.*

* * *

*I told Mr. Nardi to see a physician. If he was okay to travel with the permission from the doctor in Mexico, that is fine. It was up to him to make the disposition.* It is up to—it is the liability of the physician who is holding the patient in his hand, that is the hot potato. *I cannot make medical clearance for the man who is a thousand miles away."* (Emphasis added.)

■ Assuming, as plaintiffs contend, that they were only required to establish that Nardi exercised ordinary care for his safety *at and after* he became a passenger but not *before* he became a passenger, defendant would nonetheless have the right to establish Nardi's condition and his awareness of his condition before he took the flight as evidence of his contributory negligence in taking the flight in the first place. The issue, therefore, is not whether plaintiffs as a matter of law

were *required* to establish that Nardi exercised ordinary care for his safety before he became a passenger. Rather, the issue is American Airlines' *right* to show Nardi's medical treatment, his poor physical condition and his awareness of his illness before the flight *as evidence of his contributory negligence.* Where a plaintiff's injuries are allegedly caused by a defendant's negligence, the defendant has the right to show that the plaintiff was contributorily negligent, which question of fact is preeminently for the jury to decide. (*Borus v. Yellow Cab Co.* (1977), 52 Ill. App. 3d 194, 198, 367 N.E.2d 277.) The fact that there was no accident in this case did not alter Nardi's responsibility to exercise due care for his own safety. Defendant should have been allowed to present to the jury Dr. Eigkelboom's preflight advice to Nardi that more laboratory tests should be performed and that Nardi go to a hospital, as well as Dr. Eigkelboom's recommendation to Nardi that Nardi not travel. The defendant also should have been allowed to present to the jury Nardi's refusal to follow Dr. Eigkelboom's advice.

■ In addition, the defendant should have been allowed to present to the jury Dr. Newman's preflight admonition to Nardi to see a doctor in Mexico and to travel only with that doctor's permission and Nardi's defiance of Dr. Newman's admonitions. The excluded testimony of Eigkelboom and Newman about Nardi's preflight physical condition, their preflight advice to Nardi, Nardi's awareness of his illness and refusal to heed the doctors' advice before he became a passenger was admissible to establish Nardi's alleged contributory negligence.[2]

In *Hayes v. Alsburg* (1978), 72 Ill. 2d 560, 567, 382 N.E.2d 239, the court held that the events which occurred *hours before the car accident* were "evidentiary factors [which] in combination produce a question of

---

[2]The dissent's inference that the majority raises this issue *sua sponte* is without merit. Under Points and Authorities III in the defendant's brief, it is argued, "It was error for the court to exclude the testimony of Dr. Eigkelboom and of Dr. Newman on the warnings each gave to Nardi about flying. This testimony was relevant to the contributory negligence of Richard Nardi and of Geraldine Nardi and material to the physical condition of Nardi. ***. (A) Dr. Eigkelboom told Richard and Geraldine Nardi that Nardi had to be admitted to a hospital and could not fly. That this warning was not obeyed is evidence of contributory negligence. *** [and] (B) In telephone calls with Nardi and with his business office, Dr. Newman warned that Nardi could not fly without the clearance of a local physician—Dr. Eigkelboom." Twenty-three pages of defendant's briefs argue these issues. Plaintiffs devote no less than 22 pages of their briefs to this issue. The dissent points out, "In its opening statement, plaintiff's counsel discussed in considerable detail plaintiff's physical condition *** his case and treatment by the doctors in Acapulco, one of whom was Eigkelboom. Mrs. Nardi also testified as to her husband's physical condition while in Acapulco, including the examination and treatment by Eigkelboom and others." It would appear to be axiomatic, therefore that the defendant should not be precluded from also presenting evidence on this issue.

fact as to whether the plaintiff was in due care for her own safety, a question which was properly submitted to the jury." In that case, the plaintiff was asleep in the back seat of the car when the accident occurred at approximately 1:30 a.m. Evidence that the plaintiff and the other passengers had traveled all day and were still on the road the following morning at 1:30 a.m. was admitted; the court reasoned that a jury might have inferred from that evidence that the speeding had been continuous. The court concluded that a prudent passenger would not have gone to sleep under those circumstances. Similarly, in *Smith v. Solfest* (1978), 65 Ill. App. 3d 779, 781, 382 N.E.2d 831, the court, over plaintiff's objection as to remoteness, admitted evidence of the conduct of the parties before the automobile accident occurred on the grounds that the events which took place hours before the collision were highly probative on the issue of plaintiff's contributory negligence.

The propriety of admitting evidence of a plaintiff's pre-accident "behavior" was also addressed in *Lockett v. Bi-State Transit Authority* (1983), 94 Ill. 2d 66, 445 N.E.2d 310. *Lockett* involved a wrongful death action arising out of an accident in which the deceased pedestrian was struck by a bus driven by the defendant's employee. Prior to trial, the court granted the defendant's motion *in limine* evidence concerning the employee's driving record prior to the accident, which was "replete with instances of misconduct," and his employment history with defendant after the accident. The appellate court reversed the jury's verdict for plaintiff and remanded the case for a new trial because of plaintiff's violation of the *in limine* order. (*Lockett v. Bi-State Transit Authority* (1981), 102 Ill. App. 3d 1210.) Reversing the appellate court, the supreme court reasoned:

> "[P]roof of that [employment] record carried the potential of prejudicing the jury against defendant. That proof, however, was highly relevant, if not essential, to plaintiff's case, and to preclude its use was, in practical effect, to abolish plaintiff's cause of action for wilful and wanton misconduct \*\*\*. \*\*\*. *But to completely exclude proof of that record and all reference thereto was, in our opinion, impermissible.*" (Emphasis added.) *Lockett v. Bi-State Transit Authority* (1983), 94 Ill. 2d 66, 74, 445 N.E.2d 310.

In *Marut v. Costello* (1964), 53 Ill. App. 2d 340, 202 N.E.2d 853, *aff'd* (1965), 34 Ill. 2d 125, 214 N.E.2d 768, the plaintiff's cause of action arose out of injuries she sustained when she fell on the back stairway of her apartment building and injured her back. Denying negligence and alleging that plaintiff was contributorily negligent, the

defendant contended at trial that a previous statement by plaintiff that her hands and arms were very weak, that she could do only light cooking and that her neighbors had come in to wash and set her hair was relevant to show that plaintiff was guilty of contributory negligence in attempting to negotiate the icy steps when she did not have enough strength to hold onto the bannister to prevent her from falling. The court held that it was proper for this evidence of the plaintiff's pre-accident condition to go to the jury on the question of her contributory negligence. 53 Ill. App. 2d 340, 361, 202 N.E.2d 853.

We further note that pre-injury evidence was held to be admissible on the question of the plaintiff's alleged contributory negligence in *Babcock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 404 N.E.2d 265. In that case, a jury found the defendant guilty of negligence and awarded the plaintiff, a seven-year, nine-month-old boy, $925,000 for injuries sustained when defendant's train severed his feet. Because of the numerous trial errors which precluded the defendant from receiving a fair trial, the appeals court reversed and remanded the case for a new trial. The court explained that although the scope of cross-examination is limited to matters brought out on direct examination, this rule should not be given an overly technical or narrow interpretation which thwarts the search for truth in a lawsuit. The court further stated:

> "One of the crucial questions in this case was whether plaintiff was contributorily negligent. On direct examination, plaintiff testified, in effect, that he had exercised due care before attempting to crawl under the train. Though he never testified to any prior warnings or prior knowledge of the dangers of crawling under a train, questions concerning these matters were proper on cross-examination because they contradicted his testimony to the effect that he exercised due care.
>
> * * *
>
> Moreover, there is the possibility that if defendant had been properly allowed to ask plaintiff questions concerning his knowledge of the dangers of crawling under cars, he would have elicited responses indicating such knowledge." *Babcock v. Chesapeake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 925, 927, 404 N.E.2d 265.

The court in *Babcock* also found that the trial court improperly refused to give defendant's special interrogatory on the issue of contributory negligence. The special interrogatory asked the jury whether the plaintiff was guilty of any contributory negligence *"before and at* the time of the occurrence." (Emphasis added.) (*Babcock v. Chesa-*

*peake & Ohio Ry. Co.* (1979), 83 Ill. App. 3d 919, 927, 404 N.E.2d 265.) Citing additional trial errors, the court stated that if the defendant had been properly allowed to ask the plaintiff questions concerning his knowledge of the dangers of crawling under train cars, he possibly would have elicited responses indicating such knowledge. 83 Ill. App. 3d 919, 927, 404 N.E.2d 265.

The advice and warnings that Drs. Eigkelboom and Newman gave Nardi before the flight and Nardi's rejection thereof were admissible to show Nardi's alleged contributory negligence. We rule that that evidence should have been admitted. The trial court's exclusion of this testimony was reversible error.

The dissent's conclusion that this testimony was inadmissible and properly excluded by the trial court is premised on the assertion that plaintiff's cause of action was based upon the failure of defendant to perform a contractual duty—the exercise of the highest degree of care for Nardi after he became a passenger. The dissent therefore contends that the care due Nardi by defendant was limited to the period during which Nardi was a passenger, and thus, the preflight testimony was irrelevant and inadmissible. The dissent overlooks, however, that plaintiffs' complaint alleged, *inter alia*, that (1) on January 3, 1976, two days before Nardi's flight departed, defendant was informed that Nardi was in ill health and would require careful attention as a passenger; (2) defendant carelessly and negligently failed to summon medical treatment and medical personnel when it became apparent that Nardi was in need of medical treatment; and (3) defendant carelessly and negligently failed to immediately transport Nardi to a hospital when it became apparent that his condition required medical treatment which could be rendered only at a hospital. Plaintiffs further alleged that defendant carelessly and negligently "failed to refuse to transport or remove [Nardi from the aircraft] when it knew his mental condition was such as to render him incapable of caring for himself without assistance ***." The defendant's defense, in part, was Nardi's contributory negligence, which the jury subsequently found to have been 60%. Nardi's preflight physical condition, his awareness of his preflight physical condition and the testimony of Drs. Eigkelboom and Newman regarding his preflight condition were therefore admissible and relevant. The *in limine* order limited the proofs to Nardi's condition while he was a passenger. We will not speculate as to what Drs. Eigkelboom and Newman's opinion testimony may have been regarding the effect that Nardi's flight might have had on his physical condition.

The record establishes that Dr. Newman talked directly with

Nardi. In fact, plaintiffs so advised the jury in their opening statement. Geraldine Nardi testified that Nardi had been in contact with Dr. Newman from Acapulco. Newman admitted that Nardi called him from Acapulco. It is clear from the record in this case that Dr. Newman conditioned any travel by Nardi on the approval of a local doctor. Nardi's purpose in calling Dr. Newman was "with regard to his returning to Chicago." Newman's deposition testimony was as follows:

"Q. Now, during your telephone conversations with Mr. Nardi, do you recall telling him to see a doctor immediately, and if the doctor said you are okay, or not that good, get back here?

A. The words not that good mean that he is transportable. The decision of being transported is up—is the decision on the dispatching side.

Q. I understand that. That is what you told Mr. Nardi, or not that good; is that right?

A. Well, I am not sure I used the exact words as to that. *If he is okay to move, move out.*

Q. Is that what you told Mr. Nardi?

A. I believe so." (Emphasis added.)

It is clear that Nardi called Dr. Newman for his advice on whether to return to Chicago and that Newman told him that he should not travel without the permission of a local doctor. This conclusion is amply supported by Newman's deposition testimony. As early as January 1, 1976, the day of the flight to Acapulco, Newman advised Nardi not to travel if he did not feel well. Likewise, when Newman was contacted by Nardi's business office with respect to the arrangements being planned for Nardi's return to Chicago, Dr. Newman testified at his deposition, "I said if he is sick, and he needed to be cleared by a doctor to come home."

The record is clear that Newman told Nardi that he could not travel without the clearance of a physician in Acapulco. Nardi had an initial duty to ensure that he was physically capable of making the return flight to Chicago. Newman's testimony was clearly relevant to this obligation. It would be unfair, indeed unconscionable, to preclude defendant from revealing to the jury Nardi's preflight physical condition and the doctors' warning to him not to take the flight, particularly in view of Nardi's insistence while on board the plane not to leave the plane for medical treatment or hospitalization in Mexico, his adamant insistence to continue the flight to Chicago, and the testimony of Dr. Penechay, the Mexico City airport physician, that Nardi should be taken to a hospital, and Nardi's refusal to go.

■ The trial court further erroneously excluded the following tes-

timony of defendant's other witnesses:

1. *Captain Whitehead's testimony of his conversation with Nardi.*
Whitehead talked to Nardi before Nardi was taken to the air terminal
clinic. Whitehead was not allowed to explain to the jury why he did
not insist that Nardi leave the aircraft.

2. *Betty Westberry's testimony of her conversation with Nardi af-
ter the aircraft arrived in Mexico City.* In an offer of proof, defend-
ant stated that Westberry would testify that she told Nardi that he
should go to the clinic and obtain oxygen and that Nardi refused.

3. *Testimony of Silvia Ridolfi, translator for defendant at the
Mexico City air terminal medical clinic.* In an offer of proof, defend-
ant showed that if Ridolfi had been permitted to testify, she would
have stated that Nardi told her that he "knew what was wrong with
him. He told me also that he had a pacemaker and as long as he knew
what he had and that as long as he had oxygen, he knew he was al-
right." She would have further testified that Nardi responded that he
did not want to go to "a Mexican, a damn Mexican hospital. I don't
want to go there," and that he had a doctor and an ambulance waiting
for him in Chicago.

4. *Testimony of Dr. Michael V. Miller, a passenger.* Dr. Miller
boarded the plane in Mexico City and talked to Nardi after he was re-
turned to the aircraft. He testified that Nardi at that time was con-
scious. Although Nardi was in "some distress," "his manner of speech
was adequate to get a history." Defendant argued to the trial court
out of the presence of the jury that if permitted, Dr. Miller would have
also testified that Nardi "was adamant about wishing to return" to
Chicago.

The record reveals that the trial judge excluded the foregoing tes-
timony on the grounds of hearsay. McCormick defines hearsay as fol-
lows:

> "Hearsay evidence is testimony in court, or written evidence, of
> a statement made out of court, the statement being offered as
> an assertion to show the truth of matters asserted therein, and
> thus resting for its value upon the credibility of the out-of-court
> asserter." McCormick, Evidence sec. 246, at 584 (2d ed. 1972);
> see also Cleary, Handbook of Illinois Evidence sec. 801.1 *et seq*
> (4th ed. 1984).

The above testimony was not admissible hearsay, however, because
it was not offered to show the truth of the matters asserted therein.
(*Reynolds v. Alton & Southern Ry. Co.* (1983), 115 Ill. App. 3d 88, 98,
450 N.E.2d 402; *Goshey v. Dunlap* (1973), 16 Ill. App. 3d 29, 34, 305
N.E.2d 648.) The distinction between admissible testimony and that

which is barred by the hearsay rule is well illustrated by Wigmore's example of the witness A testifying that "B told me that event X occurred." If A's testimony is offered for the purpose of establishing that B said this, it is clearly admissible, but if offered to prove that event X occurred, it is clearly inadmissible, for the only probative value rests in B's knowledge and B is not present to be cross-examined. (6 Wigmore, Evidence sec. 1766, at 250 (Chadbourn rev. 1976).) The foregoing statements in the instant case attributed to Nardi might justifiably be construed as admissions and as such, admissible as an exception to the hearsay rule. (18 Ill. L. & Prac. *Evidence* sec. 131 (1956); McCormick, Evidence sec. 262, at 628 (2d ed. 1972).) The testimony also explained the conduct of defendant's employees and the jury was entitled to hear it. Its exclusion from the jury prevented defendant from receiving a fair trial.

■ We next consider defendant's assignment of error of the trial court's change of Illinois Pattern Jury Instruction (IPI), Civil, No. 10.03 (2d ed. 1971). IPI Civil 2d No. 10.03 reads: "It was the duty of the plaintiff, *before and at* the time of the occurrence, to use ordinary care for his own safety ***." (Emphasis added.) Over defendant's objection, plaintiffs prevailed upon the trial court to change the instruction to read: "It was the duty of the decedent, Richard Nardi, *at and after* the time he became a passenger on American Airlines Flight 104, to use ordinary care for his own safety." (Emphasis added.)

Nardi had the initial duty to ensure that he was physically capable of making the return flight to Chicago. We believe that his actions prior to his flight would bear on his contributory negligence, if any, *i.e.*, whether he exercised due care for his own safety in even taking the flight. We agree with defendant that the trial court's modification of IPI Civil 2d No. 10.03 was erroneous.

■ Next, defendant contends that it was improper for the trial court to admit Civil Aeronautics Board Rules Tariff No. Pr-6, which provides, in pertinent part:

"REFUSAL TO TRANSPORT

[C]arrier will refuse to transport or will remove at any point, any passenger *** whose *** physical condition is such as to render him incapable of caring for himself without assistance unless (i) he is accompanied by an attendant who will be responsible for caring for him en route and (ii) with the care of such attendant, he will not require unreasonable attention or assistance from employees of the carrier; *** or, *** involve any unusual hazard or risk to himself ***.

LIABILITY

Carrier is not liable for its refusal to transport any passenger or for its refusal to transport any passenger in accordance with the preceding paragraphs of this rule \*\*\*."

It is agreed that these provisions are binding on defendant and its passengers. (See *Berkman v. Trans World Airlines, Inc.* (D.C.N.Y. 1962), 209 F. Supp. 851.) Also, this CAB regulation is practically identical to defendant's flight manual regulations which were admitted into evidence as a defense exhibit. The manual provided in pertinent part:

"[A] passenger who has been permitted to start his flight should be removed only if \*\*\* his remaining aboard may seriously jeopardize his own health \*\*\* or a condition of illness \*\*\* becomes such as to require an undue amount or type of assistance en route \*\*\*."

Defendant's passenger service manual was identical. The CAB tariff and the defendant's flight regulations were relevant and admissible. The jury was entitled to this evidence for their consideration, along with other facts and circumstances in deciding the issues before it. We therefore find that the trial court did not err in admitting this evidence, nor did the court err in its jury instructions on the applicable negligence standards.

In view of the foregoing, we believe the defendant is entitled to a new trial. We therefore reverse the judgment and remand the cause for a new trial.

Reversed and remanded.

MEJDA, J.\*, concurs.

DISSENTING OPINION MODIFIED UPON DENIAL OF REHEARING

PRESIDING JUSTICE SULLIVAN, dissenting:

The reversal by the majority is based on findings (a) that reversible error occurred when certain testimony of Doctors Eigkelboom and Newman was refused and (b) that defendant was denied a fair trial by the exclusion of testimony of other defense witnesses. I disagree with both findings, and I would grant plaintiff's petition for rehearing.

Regarding the holding that the trial court committed reversible error in refusing to admit certain testimony from the two doctors, it is

---

\*This opinion was adopted as the opinion of the court prior to the retirement of Mr. Justice Mejda.

the position of plaintiffs that the trial court properly held the refused testimony to be irrelevant because it concerned conduct of Nardi taking place prior to his becoming a passenger on defendant's plane and before defendant owed him any duty of care. The majority, however, held that the refused testimony should have been admitted because defendant had a *"right* to show Nardi's physical condition and his medical treatment before the flight as *evidence of his contributory negligence."*

We note initially that the cases cited by the majority do not support this holding. In all of them, an accident was involved, and it was held in each that testimony as to plaintiff's conduct before the accident was admissible on the issue of contributory negligence. In the instant case, however, we have held that there was no accident and while, as stated in those cited cases, evidence of contributory negligence prior to but related to an accident could be admissible, the action here is based upon the alleged breach by defendant of its contractual duty as a common carrier to exercise the highest degree of care toward its passenger, Nardi. It therefore appears to me that the refused testimony of the doctors concerning conduct of Nardi before he became a passenger was properly found irrelevant to what I perceive the issues to be: namely, whether defendant breached its duty of care which arose after Nardi became a passenger and whether Nardi exercised ordinary care for his own safety after becoming a passenger.

Moreover, it is noted that the majority stated that the issue of appeal was "American Airlines' *right* to show Nardi's physical condition, his awareness of his physical condition, and his medical treatment before the flight as *evidence of his contributory negligence."* It is difficult to understand why the majority makes this statement as no such issue was raised. Defendant makes no contention or argument that it was deprived in any manner of its right to show Nardi's physical condition, his awareness thereof, and his medical treatment before the flight and, in fact, it could not do so because the jury was fully informed thereof. In his opening statement plaintiffs' counsel discussed in considerable detail Nardi's physical condition from his first hospitalization in 1972 until his death, including his care and treatment by the doctors in Acapulco, one of whom was Eigkelboom. Mrs. Nardi also testified as to her husband's physical condition while in Acapulco, including the examination and treatment by Dr. Eigkelboom and other doctors. The record further discloses that except for the excluded portion in question, the evidence deposition of Dr. Eigkelboom, a defense witness, was read by defendant's counsel to the jury (it comprised 37 pages of the record). In it he testified at length concerning Nardi's

physical condition at the time of his examination in Acapulco before the flight in question and opined that he had heart failure caused by an infarction. Dr. Newman also gave considerable testimony concerning Nardi's physical condition during the course of his treatment from December 1972 up to the time he left Chicago to go to Acapulco.

The contention actually raised by defendant is that "it was error for the court to exclude the testimony of Dr. Eigkelboom and Dr. Newman on the warnings each gave to Nardi about flying" and, in this regard, the majority made the following finding and ruling: "the advice and warnings that Doctors Eigkelboom and Newman gave Nardi before the flight and Nardi's rejection thereof was admissible to show Nardi's alleged contributory negligence. ***. The trial court's exclusion of this testimony was reversible error."

However, no advice or warning was given to Nardi about flying by either doctor. Dr. Newman stated only that in a call from Mexico he was told that Nardi was not well and he said that Nardi should see a doctor there and then Newman made the following garbled statement: "if he says you are okay, I said, or not that good, get back here." Nowhere in his testimony does Dr. Newman say or give any warning that Nardi should not travel unless he had the permission of a doctor. The substance of his testimony was that if Nardi wanted clearance to travel he would have to get it from a local doctor (in Acapulco) as he (Newman) "cannot make medical clearance for the man who was a thousand miles away."

In the excluded portion of the deposition testimony of Dr. Eigkelboom, who examined Nardi in Acapulco, he stated that his recommendation of laboratory tests was not accepted by Nardi and that he also recommended that Nardi "don't can travel too." The majority suggests that the quoted phrase was a warning that he shouldn't take the flight in question because of his physical condition. However, the doctor did not so state and gave no indication that this was his opinion. In fact, he was not asked whether Nardi could or could not fly, and it is more reasonable to believe that he wanted the tests before Nardi traveled anywhere so that he could complete his diagnosis, which it appears he would have to do before he could have given an opinion as to whether or not Nardi could fly.

In any event, there was no advice or warning to anyone by either doctor that Nardi's physical condition was such that he should not take the flight in question, and it is noted that no other doctor gave any such testimony. To the contrary, two physicians who examined Nardi while the plane was delayed in Mexico City, Dr. Penechay at the airport clinic and Dr. Miller, a passenger on the plane, both said that

he was able to continue the flight to Chicago. It is thus clear that there is no basis in the record for the holding of the majority that the exclusion of the two doctors' testimony was reversible error.

Furthermore, even assuming that the conduct of a person prior to becoming a passenger could be admissible as bearing on contributory negligence, the excluded testimony was properly refused here because there was nothing in that testimony which could be considered a proximate or contributing cause of his death. In the original majority opinion it was held that the excluded testimony should have been admitted because "defendant had the right to show that Nardi's conduct before the flight contributed to his death," but in the modified opinion that quote is deleted and in it the majority states only that the testimony was admissible to show contributory negligence on the part of Nardi. However, not considered or mentioned in either opinion is the fact that for any conduct of Nardi to be admissible under the doctrine of contributory negligence, it must have been a proximate or contributing cause of his death. See *Mock v. Sears, Roebuck & Co.* (1981), 101 Ill. App. 3d 103, 427 N.E.2d 872; *Hiller v. Harsh* (1981), 100 Ill. App. 3d 332, 426 N.E.2d 960; *Old Second National Bank of Aurora v. Baumann* (1980), 86 Ill. App. 3d 547, 408 N.E.2d 224.

Here, the most that may be gleaned from the portion of Dr. Eigkelboom's testimony that was refused is that he wanted hospital laboratory tests and recommended to Nardi that he "don't can travel," and the most that may be said of Dr. Newman's excluded testimony is that Nardi was informed that if he wanted clearance to fly to Chicago he should obtain it from a local doctor in Acapulco. It is significant that Dr. Eigkelboom did not say nor does his refused testimony even remotely indicate that the failure to have the laboratory testing in any way caused or contributed to Nardi's death. He was not asked his reason for telling Nardi that he "don't can travel too" and he made no statement and gave no opinion that Nardi's physical condition was such that he should not fly. Likewise, Dr. Newman did not say, and his testimony also does not remotely indicate, that the failure to obtain permission to fly was in any manner a proximate or contributing cause of Nardi's death. To the contrary, as noted above, the only doctors who were asked, Penechay and Miller, both stated that he was physically able to fly on to Chicago. Thus, because there was no showing that the excluded testimony concerned any conduct of Nardi which was a proximate or contributing cause of his death, it was properly excluded for that additional reason.

I disagree also with the finding of the majority that the exclusion of certain testimony of other defense witnesses denied defendant a

fair trial. The majority states that their testimony should have been received under the admissions exception to the hearsay rule, but its opinion does not state what Nardi is supposed to have admitted and, in fact, there were no admissions by Nardi in the excluded testimony. The most that may be learned therefrom is that the witnesses would have testified that Nardi did not want to leave the plane and was adamant about going to Chicago. However, there were other witnesses, including Whitehead, the pilot in command, who testified that Nardi insisted on going to Chicago and still others who testified that Nardi said he did not want to leave the plane. The excluded testimony being cumulative, no prejudice was caused to defendant, and it was not thereby deprived of a fair trial. See *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 364 N.E.2d 533.